Larry Edward HIGGINBOTHAM, Administrator of the Estate of Dallas Larry Higginbotham, Deceased, Plaintiff,

v.

VOLKSWAGENWERK AKTIENGESELLSCHAFT and Volkswagen of America, Inc., Defendants,

v.

Charles W. HUMMEL, Jr., Third-Party Defendants.

Civ. A. No. 77–1156.

United States District Court, M.D. Pennsylvania.

Nov. 30, 1982.

---

Richard C. Angino, Harrisburg, Pa., for plaintiff.

David C. Richman, Philadelphia, Pa., for Volkswagen.

Christian S. Erb, Jr., Harrisburg, Pa., for Charles W. Hummel, Jr.

## MEMORANDUM

CALDWELL, District Judge.

On December 31, 1976, Dallas Larry Higginbotham, plaintiff's decedent, was killed when the 1975 Volkswagen 'Beetle' which he was driving collided nearly head-on with a 1967 Plymouth sedan driven by third-party defendant Charles W. Hummel. Suit was brought against Volkswagenwerk Aktiengesellschaft and Volkswagen of America, Inc., and Volkswagen impleaded Hummel. The matter went to trial and, after plaintiff rested his case on June 3, 1982, the defendants' motion for a directed verdict was granted and judgment was entered in favor of defendants and against plaintiff. On June 10, 1982, the plaintiff filed a motion to vacate the directed verdict and grant a new trial. Following preparation of the trial transcript, plaintiff filed a supporting brief on August 12, 1982. Defendants' brief in opposition was filed on September 14, 1982, and the matter is now ripe for our review. The plaintiff has asserted numerous grounds for relief, which we will consider seriatim.

We shall first address the propriety of the directed verdict based on the record before us at the conclusion of the plaintiff's case, and review the questioned rulings which shaped that record.

Essential to our ruling on the motion for directed verdict was the absence in the record of any competent testimony to explain the intended function and possible failure of the collapsible steering column which, the plaintiff contends, caused the decedent's fatal injuries. The plaintiff argues that the testimony of his medical expert, Dr. William Bush, should have enabled him to reach the jury. Dr. Bush, the Dauphin County Coroner, reviewed the autopsy report as well as photographs and deposition testimony describing the circumstances

of the accident. Dr. Bush concluded that Mr. Higginbotham's death was caused by a transection of the proximal descending aorta (N.T. 190, et seq.). Dr. Bush went on to describe the manner in which such injuries occurred in the context of automobile accidents (N.T. 195–199). Finally, the doctor gave the following testimony:

> Prior to 1966, the transection of the aorta was an extremely common vehicular chest injury. Prior to 1966, steering wheels were not collapsible.... (N.T. 199)

> When collapsible steering wheels were introduced, not only statistically, but in the studies done with the cadavers, with moving pictures, this tearing effect was rarely, if ever, demonstrated. (N.T. 200)

> MR. ANGINO (plaintiff's counsel): And your studies have shown that if it collapses and if the speeds are under seventy, eighty, ninety, this shouldn't happen, this tearing effect, is that right?

> DR. BUSH: It should not happen, right. (N.T. 202)

Earlier testimony had established that both vehicles were travelling substantially slower than seventy miles per hour at the time of impact.

Plaintiff argues that he can prove a defect under Restatement of Torts 402A by showing that the product in issue malfunctioned. The malfunction in this case, he posits, can be inferred from the nature of the decedent's injuries considered in conjunction with the statistics and studies referenced by Dr. Bush. We do not agree. Even if we assume that the malfunction theory is applicable in this case,[1] we do not believe the evidence presented through Dr. Bush is sufficient to raise a jury question. We also conclude that the instant case is not the kind in which a malfunction may properly be inferred absent qualified expert testimony. The typical "malfunction" case is one in which the testimony of a fact witness, without more, enables the finder of

fact to infer the existence of a malfunction. For example, in the case of *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914 (1974), a crane operator set the crane's locking device to hold a load of pipe suspended about four feet from the ground. After checking to make sure that the lock was engaged, the operator left the cab. The load then fell, injuring Kuisis. When he returned to the cab after the accident, the operator found that the locking device was disengaged. In *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa. Superior Ct. 129, 359 A.2d 822 (1976), a truck which had been recently turned off and left by its operators inexplicably burst into flames. In both cases, with the aid of pertinent fact witnesses, the malfunction, if not the specific defect, was readily apparent to a layman without technical or scientific elaboration. In the case before us, however, the alleged defect is more subtle and complicated and the inferential leap sought by plaintiff is too great. The nature of the defect or malfunction may not be readily determined by the trier of fact on the record developed. The allegedly defective component is a collapsible steering column. No evidence was introduced, however, as to what a collapsible steering column is, how it is supposed to function, and how the column in issue did, in fact, function at the time of the accident. Thus, any conclusion that the steering column malfunctioned would rest on pure speculation.

The plaintiff asks, in effect, that the jury be permitted to infer the malfunction from the nature of the decedent's injuries. Dr. Bush testified to the statistical reduction of injuries such as those sustained by the decedent, with the advent of the collapsible steering column. He went on to say that, in his opinion, this type of injury should not occur where a car is equipped with a properly functioning collapsible steering column.[2] Dr. Bush, however, admitted ignorance of the design of collapsible steering columns or of their function. The doctor

---

1. Defendants suggest that plaintiff has not satisfied the necessary requirements for application of this theory, since he has not excluded reasonable secondary causes.

2. The doctor did not say this *could* not occur, as is suggested by plaintiff in his brief.

was unable to state how the steering column functioned at the time of the accident, and we do not believe that any statistical analysis of prior accidents could supply this crucial missing link.

██ The missing link, could, of course have been supplied by expert testimony. None was forthcoming because sanctions imposed by this court prohibited its introduction. By order of January 30, 1981, Judge Herman ordered that the plaintiff be precluded from introducing any expert evidence at trial (later construed to refer to expert evidence in technical fields such as engineering, steering column design, or automobile safety), or from presenting a claim of liability based on a 'whole car' approach or a general lack of crashworthiness. Although the plaintiff argues to the contrary, we believe that these sanctions were properly imposed. Rule 37(b)(2)(B) of the Federal Rules of Civil Procedure provides that a court may impose discovery sanctions as follows:

If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(2)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following . . .

(B) An order refusing to allow the disobedient party to support or oppose designated claim or defenses, or prohibiting him from introducing designated matters in evidence.

Although the court has broad discretion in fashioning the appropriate sanction, it is true, as the plaintiff points out that this discretion is bounded by certain constitutional considerations. In the case of *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), for example, the Supreme Court cautioned that

Rule 37 should not be construed to authorize dismissal of [a] complaint because of . . . noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability and not to willfulness, bad faith, or any fault of petitioner.

357 U.S. at 212, 78 S.Ct. at 1096, 2 L.Ed.2d at 1267.[3] It has been held that this standard should also be applied when the court imposes sanctions which are tantamount to dismissal. *See U.S. v. Sumitomo Marine and Fire Ins. Co., Ltd.,* 617 F.2d 1365 (9th Cir.1980). Plaintiff argues that the preclusion of evidence in the instant case is tantamount to dismissal and is thus improper, absent a showing of bad faith or willful disregard of the court's discovery orders.[4]

We do not agree that the plaintiff's failure to comply with the discovery orders in this instance resulted from a good faith inability to supply the required information. Instead, the sequence of events indicates a deliberate failure to comply which justifies imposition of the harshest of sanctions. The torturous course of discovery in this case has been carefully outlined by Magistrate Havas in his report of August 15, 1980, and by Judge Herman in his memorandum and order of January 30, 1981. We shall, therefore, not reiterate the facts with great detail, but shall touch on only the

---

**3.** Although quoting *Societe* with approval, the court in *National Hockey League v. Metro Hockey Club,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) upheld a trial court's dismissal of an action pursuant to Rule 37, where it found no abuse of discretion:

[Here], as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent. 427 U.S. at 643, 96 S.Ct. 2781, 49 L.Ed.2d at 751.

**4.** We believe that such sanctions may also be properly predicated on a finding of gross negligence, *See Cine Forty-Second Street Theater Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062 (2d Cir.1979).

major points. The action was initiated by the plaintiff on December 23, 1977. On March 3, 1978, the defendant propounded interrogatories which requested, *inter alia,* information concerning the qualifications and expected testimony of expert witnesses which the plaintiff expected to call at trial. By order of September 15, 1978, the Magistrate denied the plaintiff's motion for a protective order, directed that the expert interrogatories be answered, and extended the discovery deadline to November 15, 1978.[5] In answering the defendants' expert interrogatories on October 16, 1978, plaintiff merely indicated that he would exchange his expert reports for those of defendants. On November 13, 1979, defendants filed a second set of interrogatories specifically concerning plaintiff's theory of liability as the qualifications of plaintiff's experts and the substance of the facts and opinions to which they were expected to testify. On January 11, 1980, despite a March 3 trial date, plaintiff answered these interrogatories by stating that an expert had not yet been selected to testify at trial. With respect to the theory to be pursued the plaintiff answered:

> A malfunction of the impact absorbing steering column during the second collision caused the severe and fatal injuries which were sustained by the plaintiff's decedent. There may also be certain defects inherent in the seat or general crashworthiness of the vehicle itself but these are not avenues actively being pursued at the moment.

Magistrate Havas filed, on February 1, 1980, an order scheduling trial for July 7, 1980, and requiring plaintiff to inform the defendants by March 1, 1980, of the identity of each of his witnesses as well as a statement of the subject matter on which each is expected to testify and the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The Magistrate cautioned that

> Further delay in coming forward with an expert witness, together with a synopsis of his opinions will not be countenanced .... In the event Plaintiff or Defendants fail to follow the directions set forth herein the undersigned ... shall file a report and recommendation to the court recommending that the party failing to follow the directions set forth herein should be deemed to have either failed to properly prosecute or defend diligently, and the undersigned shall recommend that judgment on liability be entered against the dilatory party.[6]

Despite the magistrate's warning, on February 29, 1980, plaintiff's counsel forwarded to the defendants a letter identifying as experts Dr. Campbell and Mr. Strubble stating the essence of their testimony only in the vaguest of terms and not even in minimal compliance with the magistrate's order. Further, the letter appears to indicate a "whole car" theory of liability previously revealed by the plaintiff. On March 21, 1980, defendants filed a motion for sanctions, and a hearing before Magistrate Havas was held on the motion on June 6, 1980.

At the June 6, hearing, plaintiff's counsel stated that the case had been discussed with several dozen experts since 1977 and that these experts had suggested a "whole car type of situation" (N.T. 19). He further stated that he had worked with Dr. Campbell as early as November of 1979 on the "whole car" approach (N.T. 37), but that it was not really until the first of the year, 1980, that they had really gotten an expert for trial and "a theory as to the lack of crashworthiness in the vehicle as a whole." (N.T. 38). The magistrate's report recommending sanctions and Judge Herman's preclusion order followed this hearing.

---

**5.** The discovery deadline was subsequently extended first to June 30, 1979, then to November 15, 1979, January 15, 1980, and finally to March 25, 1980.

**6.** The magistrate had earlier cautioned, in his opinion and order of September 19, 1980, that any further controversies involving discovery ... may have a greater likelihood of resulting in sanctions if a party does not produce requested evidence which is deemed discoverable.

We believe the record as a whole evidences the plaintiff's conscious disregard of the discovery process and of the orders of this court rather than a simple inability to comply with those orders. For example, on October 16, 1978, the plaintiff in answer to interrogatories stated that he would exchange his experts' reports for those of the plaintiff, but on January 11, 1980, admitted that, despite a March 3, 1980, trial date an expert had not yet been selected for trial and that defects in the seat and general crashworthiness were not avenues then being pursued by the plaintiff. However, on June 6, 1980, plaintiff's counsel stated that he had worked with the expert he proposed to use at trial as early as November of 1979 and by January 1, 1980, had worked out with him a "whole car theory of liability." We believe this discrepancy can be characterized at the very least as a deliberate attempt to mislead the defendants. This is especially true when considered together with plaintiff's repeated failure to meet satisfactorily court imposed discovery deadlines in the face of explicit warnings of the consequences of his actions. We believe the plaintiff acted in an informed and deliberate manner and at his peril. The defendants were prejudiced in wasted trial preparation and in being misled as to plaintiff's theory of liability. That trial of this matter was ultimately delayed is beside the point. Orders of this court and the discovery process were flouted by the plaintiff. In such a case, harsh sanctions must be imposed not only to prevent prejudice to the defendants but to preserve the integrity of court-supervised discovery, thus deterring others from similar conduct. Under the circumstances, the sanctions imposed by Judge Herman were altogether proper.

The plaintiff also assigns as error the court's refusal to admit at trial plaintiff's exhibits 33 and 42,[7] both of which concerned passive restraint systems. The plaintiff argues that, despite the sanctions imposed by Judge Herman these exhibits are admissible, since the passive restraint system should properly be considered in having to do with the steering column. It is our belief that Judge Herman did not intend such a result and we will not permit it. In his memorandum and order of January 21, 1982, Judge Herman deferred ruling on the defendants' motion in limine relative to exhibit 33 until the time of trial. After describing the exhibit, Judge Herman noted, "While the court finds no references in [their exhibit] relating to steering column design or defects, Defendants have not yet objected on such grounds." (P. 4). It is clear to us that Judge Herman intended his preclusion order to exclude exhibits 33 and 42, and we therefore hold that they were properly excluded from trial for lack of relevance to the plaintiff's case, as defined by the court.[8]

Finally, the plaintiff contends that the court erred in refusing to allow Officer Ronald Allen Flowers, to testify as to "the movement of Mr. Higginbotham within his vehicle and on the nature of collapsible steering columns." (Plaintiff's brief at 21). In general, an expert witness "must have such skill, knowledge and experience in [the] field or calling as to make it appear that his opinion or influence will probably aid the trier in his search for truth." *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic & Equipment Corp.,* 546 F.2d 530 (3d Cir.1976) *cert. denied* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). Whether or not expert evidence shall be admitted rests in the sound discretion of the trial court. *See Seese v. Volkswagenwerk, A.G.,* 648 F.2d 833 (3d Cir. 1981). In the instant case, although Officer Flowers had experience as an accident investigator, he could not properly be termed

7. Exhibit 33 was a technical study dealing with passive restraint systems in Volkswagen Rabbits. Exhibit 42 concerned passive restraint systems installed in Beetles on an experimental basis. Only exhibit 33 is mentioned by plaintiff in his post trial motions, although both are referred to in the supporting brief.

8. We believe that the exhibits were also properly excluded, since, although they could be considered admissions, they could lead only to baseless speculation by the jury, without qualified expert testimony to establish a proper foundation.

a qualified expert in accident reconstruction, and he testified that he had only minimal training in preliminary aspects of this field. (N.T. 69). Similarly, he had only minimal training in the area of physics and movement of bodies (N.T. 70). Thus, Officer Flowers was not qualified to offer an opinion of the movement of Mr. Higginbotham's body inside the vehicle at the time of the accident, and his testimony was properly excluded.[9]

The plaintiff's motion to vacate the directed verdict and grant a new trial will be denied.

---

9. We assume that the purpose of the testimony sought was to show that the decedent's body struck the steering column. The plaintiff was given the benefit of this assumption for the purpose of ruling on the directed verdict (N.T. 286).