## SOCIETE INTERNATIONALE POUR PARTICIPATIONS INDUSTRIELLES ET COMMERCIALES, S. A., *v.* ROGERS, ATTORNEY GENERAL, SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, ET AL.

No. 348.   Argued May 1, 1958.—Decided June 16, 1958.

198

*John J. Wilson* argued the cause for petitioner. With him on the brief were *Roger J. Whiteford* and *Hubert A. Schneider*.

*Solicitor General Rankin* argued the cause for respondents. With him on the brief were *Assistant Attorney General Townsend, David Schwartz, Sidney B. Jacoby, Paul E. McGraw* and *Ernest S. Carsten*.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question before us is whether, in the circumstances of this case, the District Court erred in dismissing, with prejudice, a complaint in a civil action as to a plaintiff that had failed to comply fully with a pretrial production order.

This issue comes to us in the context of an intricate litigation. Section 5 (b) of the Trading with the Enemy Act, 40 Stat. 415, as amended, 50 U. S. C. App. § 5 (b), sets forth the conditions under which the United States during a period of war or national emergency may seize ". . . any property or interest of any foreign country or national . . . ." Acting under this section, the Alien Property Custodian during World War II assumed con-

trol of assets which were found by the Custodian to be "owned by or held for the benefit of" I. G. Farbenindustrie, a German firm and a then enemy national. These assets, valued at more than $100,000,000, consisted of cash in American banks and approximately 90% of the capital stock of General Aniline & Film Corporation, a Delaware corporation. In 1948 petitioner, a Swiss holding company also known as I. G. Chemie or Interhandel, brought suit under § 9 (a) of the Trading with the Enemy Act, 40 Stat. 419, as amended, 50 U. S. C. App. § 9 (a), against the Attorney General, as successor to the Alien Property Custodian, and the Treasurer of the United States, to recover these assets. This section authorizes recovery of seized assets by "[a]ny person not an enemy or ally of enemy" to the extent of such person's interest in the assets. Petitioner claimed that it had owned the General Aniline stock and cash at the time of vesting and hence, as the national of a neutral power, was entitled under § 9 (a) to recovery.

The Government both challenged petitioner's claim of ownership and asserted that in any event petitioner was an "enemy" within the meaning of the Act since it was intimately connected with I. G. Farben and hence was affected with "enemy taint" despite its "neutral" incorporation. See *Uebersee Finanz-Korp.* v. *McGrath,* 343 U. S. 205. More particularly, the Government alleged that from the time of its incorporation in 1928, petitioner had conspired with I. G. Farben, H. Sturzenegger & Cie, a Swiss banking firm, and others "[t]o conceal, camouflage and cloak the ownership, control and domination by I. G. Farben of properties and interests located in countries, including the United States, other than Germany, in order to avoid seizure and confiscation in the event of war between such countries and Germany."

At an early stage of the litigation the Government moved under Rule 34 of the Federal Rules of Civil Pro-

cedure for an order requiring petitioner to make available for inspection and copying a large number of the banking records of Sturzenegger & Cie. Rule 34, in conjunction with Rule 26 (b), provides that upon a motion "showing good cause therefor," a court may order a party to produce for inspection nonprivileged documents relevant to the subject matter of pending litigation ". . . which are in his possession, custody, or control . . . ." In support of its motion the Government alleged that the records sought were relevant to showing the true ownership of the General Aniline stock and that they were within petitioner's control because petitioner and Sturzenegger were substantially identical. Petitioner did not dispute the general relevancy of the Sturzenegger documents but denied that it controlled them. The District Court granted the Government's motion, holding, among other things, that petitioner's "control" over the records had been *prima facie* established.

Thereafter followed a number of motions by petitioner to be relieved of production on the ground that disclosure of the required bank records would violate Swiss penal laws and consequently might lead to imposition of criminal sanctions, including fine and imprisonment, on those responsible for disclosure. The Government in turn moved under Rule 37 (b)(2) of the Federal Rules of Civil Procedure to dismiss the complaint because of petitioner's noncompliance with the production order. During this period the Swiss Federal Attorney, deeming that disclosure of these records in accordance with the production order would constitute a violation of Article 273 of the Swiss Penal Code, prohibiting economic espionage, and Article 47 of the Swiss Bank Law, relating to secrecy of banking records, "confiscated" the Sturzenegger records. This "confiscation" left possession of the records in Sturzenegger and amounted to an interdiction on

Sturzenegger's transmission of the records to third persons. The upshot of all this was that the District Court, before finally ruling on petitioner's motion for relief from the production order and on the Government's motion to dismiss the complaint, referred the matter to a Special Master for findings as to the nature of the Swiss laws claimed by petitioner to block production and as to petitioner's good faith in seeking to achieve compliance with the court's order.

The Report of the Master bears importantly on our disposition of this case. It concluded that the Swiss Government had acted in accordance with its own established doctrines in exercising preventive police power by constructive seizure of the Sturzenegger records, and found that there was ". . . no proof, or any evidence at all of collusion between plaintiff and the Swiss Government in the seizure of the papers herein." Noting that the burden was on petitioner to show good faith in its efforts to comply with the production order, and taking as the test of good faith whether petitioner had attempted all which a reasonable man would have undertaken in the circumstances to comply with the order, the Master found that ". . . the plaintiff has sustained the burden of proof placed upon it and has shown good faith in its efforts [to comply with the production order] in accordance with the foregoing test."

These findings of the Master were confirmed by the District Court. Nevertheless the court, in February 1953, granted the Government's motion to dismiss the complaint and filed an opinion wherein it concluded that: (1) apart from considerations of Swiss law petitioner had control over the Sturzenegger records; (2) such records might prove to be crucial in the outcome of this litigation; (3) Swiss law did not furnish an adequate excuse for petitioner's failure to comply with the production order,

since petitioner could not invoke foreign laws to justify disobedience to orders entered under the laws of the forum; and (4) that the court in these circumstances had power under Rule 37 (b)(2), as well as inherent power, to dismiss the complaint. 111 F. Supp. 435. However, in view of statements by the Swiss Government, following petitioner's intercession, that certain records not deemed to violate the Swiss laws would be released, and in view of efforts by petitioner to secure waivers from those persons banking with the Sturzenegger firm who were protected by the Swiss secrecy laws, and hence whose waivers might lead the Swiss Government to permit production, the court suspended the effective date of its dismissal order for a limited period in order to permit petitioner to continue efforts to obtain waivers and Swiss consent for production.

By October 1953, some 63,000 documents had been released by this process and tendered the Government for inspection. None of the books of account of Sturzenegger were submitted, though petitioner was prepared to offer plans to the Swiss Government which here too might have permitted at least partial compliance. However, since full production appeared impossible, the District Court in November 1953 entered a final dismissal order. This order was affirmed by the Court of Appeals, which accepted the findings of the District Court as to the relevancy of the documents, control of them by petitioner, and petitioner's good-faith efforts to comply with the production order. The court found it unnecessary to decide whether Rule 37 authorized dismissal under these circumstances since it ruled that the District Court was empowered to dismiss both by Rule 41 (b) of the Federal Rules of Civil Procedure, and under its own "inherent power." It did, however, modify the dismissal order to allow petitioner an additional six months in which to

continue its efforts. 96 U. S. App. D. C. 232, 225 F. 2d 532. We denied certiorari. 350 U. S. 937.

During this further period of grace, additional documents, with the consent of the Swiss Government and through waivers, were released and tendered for inspection, so that by July of 1956, over 190,000 documents had been procured. Record books of Sturzenegger were offered for examination in Switzerland, subject to the expected approval of the Swiss Government, to the extent that material within them was covered by waivers. Finally, petitioner presented the District Court with a plan, already approved by the Swiss Government, which was designed to achieve maximum compliance with the production order: A "neutral" expert, who might be an American, would be appointed as investigator with the consent of the parties, District Court, and Swiss authorities. After inspection of the Sturzenegger files, this investigator would submit a report to the parties identifying documents, without violating secrecy regulations, which he deemed to be relevant to the litigation. Petitioner could then seek to obtain further waivers or secure such documents by letters rogatory or arbitration proceedings in Swiss courts.

The District Court, however, refused to entertain this plan or to inspect the documents tendered in order to determine whether there had been substantial compliance with the production order. It directed final dismissal of the action. The Court of Appeals affirmed, but at the same time observed: "That [petitioner] and its counsel patiently and diligently sought to achieve compliance . . . is not to be doubted." 100 U. S. App. D. C. 148, 149, 243 F. 2d 254, 255. Because this decision raised important questions as to the proper application of the Federal Rules of Civil Procedure, we granted certiorari. 355 U. S. 812.

## I.

We consider first petitioner's contention that the District Court erred in issuing the production order because the requirement of Rule 34, that a party ordered to produce documents must be in "control" of them, was not here satisfied. Without intimating any view upon the merits of the litigation, we accept as amply supported by the evidence the findings of the two courts below that, apart from the effect of Swiss law, the Sturzenegger documents are within petitioner's control. The question then becomes: Do the interdictions of Swiss law bar a conclusion that petitioner had "control" of these documents within the meaning of Rule 34?

We approach this question in light of the findings below that the Swiss penal laws did in fact limit petitioner's ability to satisfy the production order because of the criminal sanctions to which those producing the records would have been exposed. Still we do not view this situation as fully analogous to one where documents required by a production order have ceased to exist or have been taken into the actual possession of a third person not controlled by the party ordered to produce, and without that party's complicity. The "confiscation" of these records by the Swiss authorities adds nothing to the dimensions of the problem under consideration, for possession of the records stayed where it was and the possibility of criminal prosecution for disclosure was of course present before the confiscation order was issued.

In its broader scope, the problem before us requires consideration of the policies underlying the Trading with the Enemy Act. If petitioner can prove its record title to General Aniline stock, it certainly is open to the Government to show that petitioner itself is the captive of interests whose direct ownership would bar recovery. This possibility of enemy taint of nationals of neutral

powers, particularly of holding companies with intricate financial structures, which asserted rights to American assets was of deep concern to the Congress when it broadened the Trading with the Enemy Act in 1941 ". . . to reach enemy interests which masqueraded under those innocent fronts." *Clark* v. *Uebersee Finanz-Korp.*, 332 U. S. 480, 485. See Administration of the Wartime Financial and Property Controls of the United States Government, Treasury Department (1942), pp. 29–30; H. R. Rep. No. 2398, 79th Cong., 2d Sess. 3.

In view of these considerations, to hold broadly that petitioner's failure to produce the Sturzenegger records because of fear of punishment under the laws of its sovereign precludes a court from finding that petitioner had "control" over them, and thereby from ordering their production, would undermine congressional policies made explicit in the 1941 amendments, and invite efforts to place ownership of American assets in persons or firms whose sovereign assures secrecy of records. The District Court here concluded that the Sturzenegger records might have a vital influence upon this litigation insofar as they shed light upon petitioner's confused background. Petitioner is in a most advantageous position to plead with its own sovereign for relaxation of penal laws or for adoption of plans which will at the least achieve a significant measure of compliance with the production order, and indeed to that end it has already made significant progress. United States courts should be free to require claimants of seized assets who face legal obstacles under the laws of their own countries to make all such efforts to the maximum of their ability where the requested records promise to bear out or dispel any doubt the Government may introduce as to true ownership of the assets.

We do not say that this ruling would apply to every situation where a party is restricted by law from producing documents over which it is otherwise shown to have

control. Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation. The propriety of the use to which it is put depends upon the circumstances of a given case, and we hold only that accommodation of the Rule in this instance to the policies underlying the Trading with the Enemy Act justified the action of the District Court in issuing this production order.

## II.

We consider next the source of the authority of a District Court to dismiss a complaint for failure of a plaintiff to comply with a production order. The District Court found power to dismiss under Rule 37 (b)(2)(iii) of the Federal Rules of Civil Procedure as well as in the general equity powers of a federal court. The Court of Appeals chose not to rely upon Rule 37, but rested such power on Rule 41 (b) and on the District Court's inherent power.

Rule 37 describes the consequences of a refusal to make discovery. Subsection (b), which is entitled "Failure to Comply With Order," provides in pertinent part:

"(2) . . . If any party . . . refuses to obey . . . an order made under Rule 34 to produce any document or other thing for inspection . . . , the court may make such orders in regard to the refusal as are just, and among others the following:

.        .        .        .        .

"(iii) An order striking out pleadings or parts thereof . . . , or dismissing the action or proceeding or any part thereof . . . ."

Rule 41 (b) is concerned with involuntary dismissals and reads in part: "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him."

In our opinion, whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule .37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ as well as by authorizing any order which is "just." There is no need to resort to Rule 41 (b), which appears in that part of the Rules concerned with *trials* and which lacks such specific references to discovery. Further, that Rule is on its face appropriate only as a defendant's remedy, while Rule 37 provides more expansive coverage by comprehending disobedience of production orders by any party. Reliance upon Rule 41, which cannot easily be interpreted to afford a court more expansive powers than does Rule 37, or upon "inherent power," can only obscure analysis of the problem before us. See generally Rosenberg, Sanctions to Effectuate Pretrial Discovery, 58 Col. L. Rev. 480.

It may be that the Court of Appeals invoked Rule 41 (b), which uses the word "failure," and hesitated to draw upon Rule 37 (b) because of doubt that Rule 37 would cover this situation since it applies only where a party *"refuses* to obey." (Italics added.) Petitioner has urged that the word "refuses" implies willfulness and that it simply *failed* and did not *refuse* to obey since it was not in willful disobedience. But this argument turns on too fine a literalism and unduly accents certain distinctions found in the language of the various subsections of Rule 37.[1] Indeed subsection (b), as noted above, is itself

---

[1] Rule 37 is entitled: *"Refusal* to Make Discovery: Consequences." Different subsections refer to *"Refusal* to Answer" (a), "Expenses on *Refusal* to Admit" (c), *"Failure* of Party to Attend or Serve Answers" (d), and *"Failure* to Respond to Letters Rogatory" (e). We find no design in the Rules evidenced by this pattern of words to establish the clear distinction petitioner detects between mere failure and willful refusal insofar as Rule 37 (b) is concerned. The word

entitled *"Failure* to Comply With Order." (Italics added.) For purposes of subdivision (b)(2) of Rule 37, we think that a party "refuses to obey" simply by failing to comply with an order. So construed the Rule allows a court all the flexibility it might need in framing an order appropriate to a particular situation. Whatever its reasons, petitioner did not comply with the production order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply.

## III.

We turn to the remaining question, whether the District Court properly exercised its powers under Rule 37 (b) by dismissing this complaint despite the findings that petitioner had not been in collusion with the Swiss authorities to block inspection of the Sturzenegger records, and had in good faith made diligent efforts to execute the production order.

We must discard at the outset the strongly urged contention of the Government that dismissal of this action was justified because petitioner conspired with I. G. Farben, Sturzenegger & Cie, and others to transfer ownership of General Aniline to it prior to 1941 so that seizure would be avoided and advantage taken of Swiss secrecy laws. In other words, the Government suggests that petitioner stands in the position of one who delib-

---

"refusal," by way of example, clearly refers in several instances in subsection (a) of the Rule to noncompliance for any reason. And Rule 41 (b) in turn, discussed above in text, refers simply to *"failure* . . . to comply" but might as applied to a particular situation require a showing of willfulness to justify dismissal. (Italics added throughout.) The words "refusal" and "failure" cannot be deemed to bear a fixed meaning common to their use in all sections but must be read in the context of a particular subsection.

erately courted legal impediments to production of the Sturzenegger records, and who thus cannot now be heard to assert its good faith after this expectation was realized. Certainly these contentions, if supported by the facts, would have a vital bearing on justification for dismissal of the action, but they are not open to the Government here. The findings below reach no such conclusions; indeed, it is not even apparent from them whether this particular charge was ever passed upon below. Although we do not mean to preclude the Government from seeking to establish such facts before the District Court upon remand, or any other facts relevant to justification for dismissal of the complaint, we must dispose of this case on the basis of the findings of good faith made by the Special Master, adopted by the District Court, and approved by the Court of Appeals.

The provisions of Rule 37 which are here involved must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law, and more particularly against the opinions of this Court in *Hovey* v. *Elliott,* 167 U. S. 409, and *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322. These decisions establish that there are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause. The authors of Rule 37 were well aware of these constitutional considerations. See Notes of Advisory Committee on Rules, Rule 37, 28 U. S. C. (1952 ed.), p. 4325.

In *Hovey* v. *Elliott, supra,* it was held that due process was denied a defendant whose answer was struck, thereby leading to a decree *pro confesso* without a hearing on the merits, because of his refusal to obey a court order pertinent to the suit. This holding was substantially modified by *Hammond Packing Co.* v. *Arkansas, supra,* where the

Court ruled that a state court, consistently with the Due Process Clause of the Fourteenth Amendment, could strike the answer of and render a default judgment against a defendant who refused to produce documents in accordance with a pretrial order. The *Hovey* case was distinguished on grounds that the defendant there was denied his right to defend "as a mere punishment"; due process was found preserved in *Hammond* on the reasoning that the State simply utilized a permissible presumption that the refusal to produce material evidence ".. . . was but an admission of the want of merit in the asserted defense." 212 U. S., at 350–351. But the Court took care to emphasize that the defendant had not been penalized ". . . for a failure to do that which it may not have been in its power to do." All the State had required "was a *bona fide* effort to comply with an order . . . , and therefore any reasonable showing of an inability to comply would have satisfied the requirements . . ." of the order. 212 U. S., at 347.

These two decisions leave open the question whether Fifth Amendment due process is violated by the striking of a complaint because of a plaintiff's inability, despite good-faith efforts, to comply with a pretrial production order. The presumption utilized by the Court in the *Hammond* case might well falter under such circumstances. Cf. *Tot* v. *United States,* 319 U. S. 463. Certainly substantial constitutional questions are provoked by such action. Their gravity is accented in the present case where petitioner, though cast in the role of *plaintiff,* cannot be deemed to be in the customary role of a party invoking the aid of a court to vindicate rights asserted against another. Rather petitioner's position is more analogous to that of a *defendant,* for it belatedly challenges the Government's action by now protesting against a seizure and seeking the recovery of assets which were summarily possessed by the Alien Property Custodian

without the opportunity for protest by any party claiming that seizure was unjustified under the Trading with the Enemy Act. Past decisions of this Court emphasize that this summary power to seize property which is believed to be enemy-owned is rescued from constitutional invalidity under the Due Process and Just Compensation Clauses of the Fifth Amendment only by those provisions of the Act which afford a nonenemy claimant a later judicial hearing as to the propriety of the seizure. See *Stoehr* v. *Wallace,* 255 U. S. 239, 245–246; *Guessefeldt* v. *McGrath,* 342 U. S. 308, 318; cf. *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481, 489.

The findings below, and what has been shown as to petitioner's extensive efforts at compliance, compel the conclusion on this record that petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control. It is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign. Of course this situation should be distinguished from one where a party claims that compliance with a court's order will reveal facts which may provide the basis for criminal prosecution of that party under the penal laws of a foreign sovereign thereby shown to have been violated. Cf. *United States* v. *Murdock,* 284 U. S. 141, 149. Here the findings below establish that the very fact of compliance by disclosure of banking records will itself constitute the initial violation of Swiss laws. In our view, petitioner stands in the position of an American plaintiff subject to criminal sanctions in Switzerland because production of documents in Switzerland pursuant to the order of a United States court might violate Swiss laws. Petitioner has sought no privileges because of its foreign citizenship which are

not accorded domestic litigants in United States courts. Cf. *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 133–135. It does not claim that Swiss laws protecting banking records should here be enforced. It explicitly recognizes that it is subject to procedural rules of United States courts in this litigation and has made full efforts to follow these rules. It asserts no immunity from them. It asserts only its *inability* to comply because of foreign law.

In view of the findings in this case, the position in which petitioner stands in this litigation, and the serious constitutional questions we have noted, we think that Rule 37 should not be construed to authorize dismissal of this complaint because of petitioner's noncompliance with a pretrial production order when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of petitioner.[2]

This is not to say that petitioner will profit through its inability to tender the records called for. In seeking recovery of the General Aniline stock and other assets, petitioner recognizes that it carries the ultimate burden of proof of showing itself not to be an "enemy" within the meaning of the Trading with the Enemy Act. The Government already has disputed its right to recovery by relying on information obtained through seized records of I. G. Farben, documents obtained through petitioner, and depositions taken of persons affiliated with petitioner. It may be that in a trial on the merits, petitioner's

---

[2] The Government relies in part upon a number of British prize cases in support of its position that dismissal without adjudication on the merits is justified where a party is prevented by foreign laws from satisfying a court order. However these cases are to be interpreted, they are not persuasive authority on the issue before us. We are here concerned with the interpretation to be accorded rules governing procedure in the federal courts and with constitutional doctrine underlying these rules.

inability to produce specific information will prove a serious handicap in dispelling doubt the Government might be able to inject into the case. It may be that in the absence of complete disclosure by petitioner, the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events. So much indeed petitioner concedes. But these problems go to the adequacy of petitioner's proof and should not on this record preclude petitioner from being able to contest on the merits.

On remand, the District Court possesses wide discretion to proceed in whatever manner it deems most effective. It may desire to afford the Government additional opportunity to challenge petitioner's good faith. It may wish to explore plans looking towards fuller compliance. Or it may decide to commence at once trial on the merits. We decide only that on this record dismissal of the complaint with prejudice was not justified.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.