45 F.3d 440
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 RNW ASSOCIATES, INC., Plaintiff-Appellee/Cross-Appellant,
v.
CORPORATE UNDERWRITERS, LTD.; Risk Managers International,
Inc.; Herschel Hancock, Individually; Harry
Thompson, Individually,
Defendants-Appellants/Cross-Appellees.
 Nos. 93-6327, 93-6338.
 United States Court of Appeals, Tenth Circuit.
 Dec. 23, 1994.
 
 Before MOORE, MCWILLIAMS, and ANDERSON, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 These cross appeals following a jury trial challenge the district court's jurisdictional and evidentiary rulings and fashioning of relief. Having read the briefs and reviewed the record, however, we are unpersuaded the district court erred in exercising personal jurisdiction over a British West Indies insurance company and its stateside representatives, and in holding the Federal Rules of Civil Procedure take precedence over a British West Indies ordinance prohibiting disclosure of corporate financial records. Further, the district court correctly required plaintiff to elect a remedy, choosing between recision of the insurance contract and damages and properly dismissed a named defendant from the action. We therefore affirm.
 
 No. 93-6327
 
 2
 So well-versed are the parties in the facts of the case, we eschew their repetition here save when necessary to illuminate the issues before us. In challenging the district court's exercise of in personam jurisdiction, defendants, Corporate Underwriters, Ltd., a nonadmitted, nonapproved offshore insurance company incorporated under the laws of the British West Indies with its principal place of business on the Turks and Caicos Islands; Risk Management Incorporated (RMI), its onshore representative headquartered in Dallas, Texas; Herschel Hancock, RMI's chief executive officer; and Harry Thompson, an independent Texas business consultant familiar with Corporate Underwriters, alleged that but for the mere fortuity of a visit to Oklahoma, their contact with the forum state falls short of that necessary to satisfy traditional notions of fair play and substantial justice.
 
 
 3
 However, the factual underpinning for the district court's conclusion defendants did not meet their burden of proving the court's exercise of jurisdiction offended due process was a meeting in Edmond, Oklahoma, on March 15, 1989. At that time, plaintiff, RNW Associates, a Wisconsin employee leasing business, represented by its principal officers, Bob and Wanda Mathewson, met defendants at the Edmond office of Dick Gale. Mr. Gale operated an insurance claims management service and, at the Mathewsons' request, was assisting RNW to procure an affordable workers' compensation policy. Mr. Gale asked Mr. Hancock and Mr. Thompson to meet the Mathewsons to answer questions and explain the coverage Corporate Underwriters had proposed based on the financial information RNW provided. This meeting concluded with the Mathewsons' handing over a check in partial payment of the initial premium requirements. Although the Mathewsons later opened an office in Oklahoma and added this site to their coverage, the bulk of RNW's communications and correspondence with Corporate Underwriters travelled between RNW headquarters in Osceola, Wisconsin, and RMI's Dallas office.
 
 
 4
 While defendants continue to characterize this contact as random and fortuitous, in substance, the Edmond meeting, as the district court found, created a "substantial connection" with the forum state, permitting defendants to engage in the privilege of doing business in Oklahoma. Assured that the policy would provide coverage in those states where RNW operated, RNW made partial payment on the insurance policy and agreed to a payment schedule with defendants in Edmond. These factual findings are not clearly erroneous nor do they spawn an error in law.
 
 
 5
 In McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957), the Court held it "sufficient for purposes of due process that the suit was based on a contract which had substantial connection with the state's courts." In its complaint, RNW invoked the laws of the state of Oklahoma, alleging the policy was void and seeking recision under Okla. Stat. tit. 36, 1102. Moreover, RNW alleged defendants made fraudulent representations during the Edmond meeting, specifically assuring although unlicensed in those states where coverage was sought, that status would be secured. "Personal jurisdiction may be exercised over a non-resident defendant who, while present in the forum state, makes a deliberate misrepresentation during the course of negotiations or other direct oral communications with the plaintiff." Carteret Sav. Bank, F.A. v. Shushan, 954 F.2d 141, 146 (3d Cir.), cert. denied, 113 S.Ct. 61 (1992). Additionally, RNW specifically amended the policy to cover the Oklahoma office it opened, many of its leased truckers traveling through that area.
 
 
 6
 Moreover, contrary to defendants' contention, the exercise of personal jurisdiction did not offend those traditional notions of fair play and substantial justice the Fourteenth Amendment protects. Defendant Corporate Underwriters' agents travelled to Oklahoma where, as a consequence of their discussions, they received substantial commissions on the policy they effectuated. Had RNW failed to meet the essential terms of that policy, the proverbial shoe then on the other foot, defendants could have chosen to enforce the contract in Oklahoma's courts. The district court correctly found the facts and applied legal precedent in this case, and we hold properly exercised in personam jurisdiction over nonresident defendants.
 
 
 7
 Next, defendants assert error in the district court's ordering them to produce Corporate Underwriters' financial statement although its CEO in good faith explained British West Indies law prohibited its disclosure.[2] Corporate Underwriters' chief executive officer, Rashid Bodhanya, testified he was prevented from disclosing the corporate financial documents the court ordered by the Confidential Relationships Ordinance of 1979 of the Turks & Caicos Islands. In the face of this explanation, defendants maintain, to sanction them for failure to obey the order was error. Defendants rely on In re Westinghouse Elec. Corp. Uranium, 563 F.2d 992 (10th Cir.1977), and the Restatement (Second) of the Foreign Relations Law of the United States 40 (1965).[3]
 
 
 8
 While we have adopted a good faith approach to evaluate production orders when the disclosure laws of one country conflict with those of another, Arthur Andersen & Co. v. Finesilver, 546 F.2d 338, 341 (10th Cir.1976), cert. denied, 429 U.S. 1096 (1977), before we will impose sanctions in such a case, we have endeavored to balance the Restatement factors to determine the national interest at stake. In re Westinghouse, 563 F.2d at 992.
 
 
 9
 The good faith approach was first announced in Societe Internationale v. Rogers, 357 U.S. 197 (1958), in which the Court held due process barred dismissal of the plaintiff's case when failure to comply with a production order was not willful, in bad faith, or fostered by his own conduct. In that case, the Court noted plaintiff's effort to obtain waivers for some documents Swiss law deemed undisclosable. The Court stated, to meet the good faith test, the party resisting discovery must have made efforts "to the maximum of [its] ability," id. at 211-12, to comply and must not have "deliberately courted legal impediments" to the production of the documents. Id. at 208-09.
 
 
 10
 In this case, the district court, after arguments of counsel, interpreted the British West Indies ordinance to permit the court to be "a person or entity entitled to possession of this information for the purpose of trial." It further stated,
 
 
 11
 [I]n any event, I'm satisfied that if an entity--a company is going to do business in the United States, they must anticipate--anticipate complying with the laws of the United States, including the rules and regulations governing trials in federal courts, and one of those is that in situations like this, you must be prepared to reveal certain financial information.
 
 
 12
 From the record before us, it does not appear defendants either made any showing of possible accommodation or offered an explanation of their complete resistance to the court's order. In the face of a good faith analysis or under the factors enumerated in 40 of the Restatement (Second), defendants then failed to provide any alternative to the court's lawful discovery order.
 
 
 13
 In this critical respect, this case is different from In re Westinghouse, 563 F.2d at 992. There, defendants made efforts to comply with discovery orders and sought exemptions from the Canadian nondisclosure regulation. Thus, weighing the Restatement factors as set forth in Societe Internationale and acknowledging the dilemma a party subjected to contradictory laws must face, we concluded the district court abused its discretion in imposing civil contempt on defendants with a substantial daily fine.
 
 
 14
 In contrast, we cannot conclude the district court abused its discretion by ordering production of the financial records or in selecting the sanction of instructing the jury that Corporate Underwriters had failed to comply with its order. With only Corporate Underwriters' bare assertion it faces penal sanction and substantial fines if it complies, the district court properly enforced its discovery rules.
 
 
 15
 Finally, there was ample evidence, contrary to defendants' contention, of Corporate Underwriters' breach of the October 12, 1989 Letter Agreement (the Agreement). Defendants' reading of the Agreement elevates form over substance, eliminating the clear meaning of its language and unreasonably narrowing its import.
 
 
 16
 The first paragraph of the Agreement, a letter on RMI stationery signed by Fred Goad, an RMI claims manager, stated,
 
 
 17
 I have been instructed by Corporate Underwriters to inform you that Corporate Underwriters will provide you a defense for any legal action brought against you as a result of the worker's compensation policy afforded to you by Corporate Underwriters. This defense will also be afforded to anyone else if the legal action arises out of the validity of the worker's compensation policy provided R.N.W. by Corporate Underwriters.
 
 
 18
 The Agreement further instructed that upon Mr. Mathewson's signing and returning a copy of the Agreement, "I will then take the necessary steps to engage a Minnesota Attorney and will have him communicate with you."
 
 
 19
 When the State of Minnesota informed RNW it would not honor RNW's workers' compensation insurance because Corporate Underwriters was not licensed to do business in Minnesota, RNW sought RMI's assistance to contest Minnesota's action. RNW provided testimony from Mr. Mathewson and the deposition of Michael Hatch, an attorney who represented RNW clients in litigation with the Minnesota Workers' Compensation Assigned Risk Pool, in an effort to stave off assessments related to the state's refusal to accept Corporate Underwriters. Those assessments would have been levied against companies that leased employees from RNW which had agreed to provide truck drivers who were covered by workers' compensation. Although these actions at that time were not brought directly against RNW, the litigation arose out of the invalidation of the Corporate Underwriters' workers' compensation policy. RNW chose to defend the actions only after RMI refused to respond to Mr. Mathewson's requests for assistance.
 
 
 20
 The record contains substantial evidence of Corporate Underwriters' breach of the Agreement. The State of Minnesota's refusal to accept an unlicensed insurance company to qualify to do business in satisfaction of its statutory requirements for workers' compensation coverage was a decision that arose out of "the worker's compensation policy afforded to you by Corporate Underwriters." Defendants' contention RNW was not directly sued and chose to voluntarily pay claims is self-serving. The jury had substantial evidence to support its finding.
 
 No. 93-6338
 
 21
 RNW contends the district court erred by forcing it to elect a remedy, choosing between recision of the insurance contract or the approximately $540,000 in compensatory and punitive damages the jury awarded for fraud, breach of the Letter Agreement, and negligence against Corporate Underwriters, RMI, and Mr. Hancock. RNW contends the court's order, erroneously premised on the prohibition against double recovery, prevents it from pursuing all of the remedies awarded until at least one is satisfied.
 
 
 22
 We disagree. However thorny the election doctrine in Oklahoma jurisprudence, see Fraser, Election of Remedies: An Anachronism, 29 Okla. L.Rev. 1 (1976), its confusion lies in the "word [remedy, which] refers not to the cause of action nor to any part thereof, but rather to the ultimate object of or end result sought to be achieved by the action's prosecution--in other words redress or relief as distinguished from the offended right which gave birth to the need for a remedy." Board of County Comm'rs of Tulsa v. Harkey, 601 P.2d 125, 127 (Okla.App.1979). For an election of remedies to be appropriate, "a party must show that his adversary had full knowledge of all material facts affecting plural available remedies, that the remedies sought are repugnant and inconsistent, and that he has been injured as a result of plaintiff's pursuit of two such remedies." Id.
 
 
 23
 Our de novo review of the district court's application of this state law, Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp., 959 F.2d 868, 871 (10th Cir.1992), reveals no error in its requiring RNW to choose between recision and damages. The core of this action was a contract. The predicate of a recision remedy is a disaffirmance of that contract while a damages remedy affirms the contract. Obviously, the factual basis for the two remedies is the same. To permit RNW to pursue a recision remedy, as it argues, and upon satisfaction, to seek damages, which RNW characterizes as not inconsistent and at which point "the election of remedies doctrine would bar RNW's recovery," is unsupported by Oklahoma law. Z.D. Howard Co. v. Cartwright, 537 P.2d 345, 349 (Okla.1975). Indeed, we are mindful the underbelly of this case remains RNW's effort to obtain cheaper workers' compensation insurance from an unlicensed and unapproved offshore insurer in an effort to market the affordability of its own business services. That the jury found in its favor should be sufficient reward under all of the circumstances.
 
 
 24
 Similarly, the district court properly dismissed Mr. Thompson from the action upon finding no evidence to "hold him in this lawsuit." When questioned, RNW's counsel offered nothing specific other than the broad allegations of "failing to discharge his obligations, common law obligations of ordinary care in getting a policy that worked." Our review of the record supports the district court's dismissal. We therefore AFFIRM these cross appeals in all respects.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 RNW sought disclosure to support its trial theory that Corporate Underwriters was a sham corporation. In addition, RNW contended the financial statement was necessary for the jury to assess punitive damages
 
 
 [3]
 The Restatement (Second) considers five factors to help determine when a state's law requires a person to engage in conduct that is contrary to the law of another nation:
 (a) vital national interests of each of the states,
 (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
 (c) the extent to which the required conduct is to take place in the territory of the other state,
 (d) the nationality of the person, and
 (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.