In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 14-3294

CHOICE HOTELS INTERNATIONAL, INC.,

*Plaintiff-Appellee,*

*v.*

ANUJ GROVER, ARJUN GROVER, and DHARAM PUNWANI,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:11-CV-290-JVB — **Joseph S. Van Bokkelen**, *Judge.*

———————————

ARGUED MAY 28, 2015 — DECIDED JULY 7, 2015

———————————

Before BAUER, EASTERBROOK, and RIPPLE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Choice Hotels sued SBQI, Inc., plus several of its managers and investors, seeking damages for a breach of a franchise agreement. The defendants did not answer the complaint, and the clerk of court entered a default. One of the defendants, Tarranpaul Chawla, an attorney admitted to practice in Illinois, represented the others but did so poorly, which led to the default. Three of the defendants—Anuj Grover, Arjun Grover, and Dharam

Punwani (collectively the Investors)—asked Chawla to find
a new attorney. They assert that until this suit was filed they
had been unaware that their signatures were on the fran-
chise agreement as parties, which could make them person-
ally liable, and they insist that the signatures are forgeries.
Chawla told the Investors that Elton Johnson had agreed to
represent their interests by trying to vacate the default, nego-
tiate a settlement, and if necessary defend against Choice
Hotels' demand for damages.

Johnson filed an appearance and took some steps in the
litigation, such as attending a conference under Fed. R. Civ.
P. 16. But he did not answer the complaint or file a motion to
vacate the default, engage in discovery concerning damages,
respond to Choice Hotels' request for admissions, or reply to
its motion for summary judgment on damages. In response
to email requests from Anuj Grover, Johnson insisted that he
was trying to settle the litigation. But he did not say what he
was doing or share with the Investors any documents he
filed in the suit. He did not return phone calls. Eventually
the district court set damages at $430,286.75, and on June 26,
2013, the court entered a final judgment in that amount.

The default judgment led the Investors to hire a new
lawyer, who filed a motion seeking to set aside the judg-
ment. Because it was filed more than a year after the judg-
ment, however, it fell into Fed. R. Civ. P. 60(b)(6), the residu-
al clause, which covers "any other reason that justifies relief"
(that is, any reason other than ones in Rule 60(b)(1) to (5)). A
motion under Rule 60(b)(6) is addressed to the district
court's discretion, and appellate review is correspondingly
deferential. See *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d
826 (7th Cir. 1985). As a substantive matter, relief under Rule

60(b)(6) requires the movant to establish that "extraordinary circumstances" justify upsetting a final decision. See *Gonzalez v. Crosby*, 545 U.S. 524, 535–38 (2005).

The district court thought these circumstances to be short of "extraordinary." Lawyers sometimes fail to protect their clients' interests, and the district judge observed that the remedy for legal neglect lies in a malpractice suit against the lawyer, rather than continuing the original litigation and upsetting the adversary's legitimate expectations based on a final judgment. Litigants who choose a poor lawyer may bear the costs themselves, or shift them to the lawyer, but cannot shift them to an adversary who bore no fault for the problem. (Johnson unquestionably is a poor lawyer. The Supreme Court of Indiana suspended him from practice on March 20, 2014, less than four years after his admission to the bar, following five disciplinary complaints against him. His suspension—for failure to cooperate in the investigation of these grievances—is of indefinite duration, and he has been removed from the roll of attorneys authorized to practice in the Northern District of Indiana.)

The district court's approach is well grounded in decisions of the Supreme Court and this circuit. *Link v. Wabash R.R.*, 370 U.S. 626 (1962), holds that litigants are bound by the acts and omissions of their chosen agents, including lawyers, and that legal bungling therefore does not justify reopening a judgment. The Supreme Court added in *Societe Internationale v. Rogers*, 357 U.S. 197 (1958), and *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976), that the intentional misconduct of lawyers likewise is imputed to their clients. And when a client aggrieved by counsel's inept handling of a suit contended that "gross negligence"

should be treated differently from ordinary negligence (*Link*) and intentional misconduct (*National Hockey League*), we rejected the argument and held that labels do not matter. *United States v. 7108 West Grand Avenue*, 15 F.3d 632 (7th Cir. 1994). When lawyers fail, the remedy is malpractice litigation against the wrongdoer, not more litigation against an innocent adversary in the original litigation. We summed up in *Bakery Machinery & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009):

> The rule is that *all* of the attorney's misconduct (except in the cases where the act is outside the scope of employment or in cases of excusable neglect [and covered by Rule 60(b)(1)]) becomes the problem of the client. A lawyer who inexcusably neglects his client's obligations does not present exceptional circumstances.

That conclusion cannot be avoided by calling an attorney's failure to file critical documents "nonfeasance" rather than "misfeasance." That would be just another exercise in labeling. *Link* and most of its successors involved one or more omissions—things not done at all—in addition to things done badly. Indeed, both *7108 West Grand Avenue* and *Bakery Machinery* were about inaction; the opinion in *7108 West Grand Avenue* arises from the sort of inaction that Johnson displayed. Our conclusion that labels do not matter applies to any other proposed relabeling. *Tolliver v. Northrop Corp.*, 786 F.2d 316 (7th Cir. 1986), another case in which the lawyer did nothing to protect the client (and which the Investors therefore would call a case of nonfeasance), explains why it is important to visit the consequences on the bad lawyer rather than the innocent adversary:

> Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply. If the lawyer's neglect protected the client from ill consequences, neglect would

> become all too common. It would be a free good—the neglect would protect the client, and because the client could not suffer the lawyer would not suffer either. The court's power to dismiss a case is designed both to elicit action from the parties in the case at hand and to induce litigants and lawyers in other cases to adhere to timetables. A court cannot lightly excuse a litigant because of the lawyer's neglect without abandoning the pursuit of these objectives.

*Id*. at 319 (citation omitted).

But the Investors tell us that the Supreme Court *has* abandoned the pursuit of these objectives and disapproved the holdings of *Bakery Machinery* and the earlier decisions that we have cited. They rely on *Holland v. Florida*, 560 U.S. 631 (2010), and *Maples v. Thomas*, 132 S. Ct. 912 (2012). *Holland* holds that abandonment by counsel can justify tolling of the statute of limitations for filing a federal collateral attack on a state conviction, and *Maples* holds that abandonment by counsel during a state collateral attack can constitute a justification for a procedural default, and thus permit federal review of an issue that was not properly presented in the state proceeding.

Both *Holland* and *Maples* were capital cases. Being put to death is a disproportionate penalty for having a bad lawyer—especially when as a practical matter persons on death row (and for that matter other prisoners) have only limited opportunity to choose their own counsel. They must accept volunteers, and if they fire a volunteer they cannot be sure that someone else will step in, for they lack funds to hire counsel. (*Holland* suggested that the prisoner *had* tried to discharge his lawyer but that neither counsel nor the state judiciary had honored his request.) A malpractice suit against a nonperforming lawyer is cold comfort to someone no longer

alive. Abandonment severs the agency relation, see *Maples*, 132 S. Ct. at 922–23; *Holland*, 560 U.S. at 659–60 (Alito, J., concurring) (a view adopted by a majority in *Maples*), so that counsel's (in)action is not imputed to the client. In normal civil litigation a litigant whose lawyer has left him in the lurch can hire a new one, or represent himself, but people on death row can't replace their lawyers so easily.

Although *Maples* and *Holland* were capital cases, we do not doubt that their holdings apply to all collateral litigation under 28 U.S.C. §2254 or §2255. See *Gibbs v. LeGrand*, 767 F.3d 879, 893 (9th Cir. 2014); *Cadet v. Florida Department of Corrections*, 742 F.3d 473, 482 (11th Cir. 2014). All prisoners face difficulties in obtaining and monitoring the performance of counsel, and damages for malpractice are a poor substitute for time in prison, just as they are no substitute for one's life. But these considerations are inapplicable to normal civil litigation, and the Supreme Court has not suggested that *Holland* or *Maples* has any bearing on suits about torts, contracts, and other economic matters.

For litigants such as the Investors, monetary compensation via a malpractice action is an adequate recompense for an adverse judgment. (Litigants who fear that lawyers may not have the wealth to pay for their mistakes can decline to hire counsel who lack adequate insurance.) Civil litigants can hire replacement counsel freely, and it is much easier for them than for prisoners to monitor how their lawyers are performing (or not performing). And although abandonment by counsel ends the agency relation—a consideration relevant to all litigation, not just to collateral review, see *Sneed v. Shinseki*, 737 F.3d 719, 726–28 (Fed. Cir. 2013)—the fact remains that civil litigants are responsible for their own

choices and their own inaction. Litigants who know or strongly suspect that their lawyers are asleep on the job must act to protect their own interests by hiring someone else.

The Investors recognized that Chawla was not protecting their interests, and they sensibly insisted that he find some- one who would. When they began to suspect that Johnson likewise was not protecting their interests, they did not re- place him. Sending him emails, and making unreturned phone calls, is no substitute for action. They readily could have consulted the docket in the litigation and learned that Johnson was not filing essential documents, but they didn't. Johnson did not abandon the investors; he performed some legal tasks, though not enough, and responded to three of Anuj Grover's inquiries. Unlike the attorneys in *Thomas* and *Maples*, he had not cut off all communication with his clients and walked away from the litigation. But even if we were to treat the Investors as abandoned by Johnson, still they must bear the consequences of their own inaction. They were sued and did not defend the litigation, personally or by counsel. They were able to monitor the proceedings yet did not fol- low through. The district judge therefore did not abuse his discretion in denying their motion for relief from judgment.

AFFIRMED