# IN THE SUPREME COURT OF TEXAS

No. 16-0922

ALTESSE HEALTHCARE SOLUTIONS, INC.,
AND SHAWNA BOUDREAUX, PETITIONERS,

v.

ALLEN WILSON AND BECKY WILSON, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**PER CURIAM**

Trial courts have broad authority to impose appropriate sanctions on recalcitrant litigants. *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997). That authority is not, however, without limits. We previously held that "a direct relationship must exist between the offensive conduct and the sanction imposed." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). In other words, a court imposing sanctions must seek to ensure that "[t]he punishment . . . fit[s] the crime." *Id.* Accordingly, so-called death-penalty sanctions, under which the offending party essentially loses the case because of the sanction, are generally reserved for the most egregious cases in which the offending party's conduct justifies a presumption that its claims lack merit. *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 184 (Tex. 2012).

In this case, the trial court imposed, and the court of appeals affirmed, sanctions even more severe than death-penalty sanctions for the defendants' failure to fully comply with a temporary restraining order. The sanctions made the plaintiffs better off than if they had succeeded on the merits of their claims. While we take seriously the defendants' violation of the restraining order, we conclude that the defendants' conduct did not justify the extreme punishment imposed. We therefore reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

Plaintiffs Becky and Allen Wilson were the owners and sole shareholders of ABACAW Enterprises, Inc., a home healthcare company serving primarily elderly patients. Under a June 21, 2014 agreement, the Wilsons sold their business to defendant Altesse Healthcare Solutions, Inc., a company owned by defendant Shawna Boudreaux. The agreement provided for a transfer of all ABACAW's stock from the Wilsons to Altesse in exchange for a purchase price of $800,000, to be paid in installments beginning on October 15, 2014. Boudreaux personally guaranteed the payments.

After the agreement was signed, Altesse began running the business. On October 15, 2014, Altesse and Boudreaux (collectively Altesse) failed to make the first payment due under the agreement and instead sued the Wilsons in federal court, alleging a federal securities-fraud claim and invoking pendent jurisdiction over related state-law claims. Altesse alleged that the Wilsons misrepresented and failed to disclose material facts in the sale of ABACAW. Specifically, Altesse alleged that the Wilsons misrepresented the number of ABACAW patients, Medicare reimbursements due, an agreement with a landlord, and other facts.

2

On December 16, the Wilsons sued Altesse in state court for damages and injunctive relief, alleging that Altesse breached the parties' contract by failing to make the first payment. The Wilsons immediately sought a temporary restraining order. On December 17, attorneys for both sides appeared before the trial court. Without taking evidence, the court signed a TRO that prohibited Altesse from contacting ABACAW's employees, contractors, and patients, and from holding itself out as operating the business. It required Altesse to return to the Wilsons, within three days, all assets of ABACAW, access to the business and various business records and documents, administrator access and password information, and documents reflecting current patients, current employees, and patient records. The assets Altesse was required to turn over included ABACAW's Medicare license, provider numbers, accounts receivable, "all clients of ABACAW," computers and other physical equipment, and various records.

The TRO was set to expire on December 31. The TRO set a hearing for December 22 on the Wilsons' application for temporary injunction. On December 19, Altesse filed an emergency motion to set aside the TRO and later that day filed a notice of removal of the state-court action to federal court. The removed case was assigned to the federal court already hearing Altesse's federal complaint. On January 30, 2015, the federal court granted the Wilsons' motion to remand, concluding that removal jurisdiction was lacking and that "removal was clearly done in an attempt to avoid the [TRO] and delay the . . . equitable relief granted by the state court." As best we can tell, the federal court retained Altesse's original complaint.

After remand, Altesse was under no obligation to continue to comply with the TRO, which had expired. The Wilsons did not request a hearing on a temporary injunction that might have continued the relief granted by the TRO. But on March 19, 2015, the Wilsons filed a motion for

3

contempt and sanctions, alleging that Altesse violated the TRO. The trial court conducted an evidentiary hearing on this motion that lasted about 2.5 hours. At the hearing, Mr. Wilson testified that during the term of the TRO, Altesse transferred funds out of ABACAW's bank account and failed to return certain physical assets. Wilson testified that, during the TRO period, ABACAW went from treating 55 patients to just three and that he could document that 20 or 21 of these patients had transferred to a new company Boudreaux formed called Trinicare. Wilson also testified that Boudreaux had drawn down $46,000 on a line of credit. Boudreaux admitted that, during the term of the TRO, Altesse held itself out as an owner or agent of ABACAW, used ABACAW's Medicare provider number, National Provider Number, and Medicare license, and contacted ABACAW's patients. She admitted that she depleted assets of ABACAW during the term of the TRO, but she also claimed the Wilsons had left her with almost $200,000 in debt when she acquired the business. She testified that she transferred all ABACAW assets in her possession to the Wilsons by December 29, 2014, before the TRO expired.

On April 21, the trial court signed an order granting the motion for contempt and sanctions. The order stated that "death penalty sanctions should be imposed" against Altesse. It awarded sanctions of $897,937.51. This amount included the full $800,000 contractual purchase price of the business, attorney's fees, and an award reflecting cash transfers Altesse made during the term of the TRO. On April 27, the trial court signed a final judgment for the same amount. The court of appeals affirmed the judgment. ___ S.W.3d ___ (Tex. App.—Dallas 2016).

We review a trial court's ruling on a motion for sanctions for abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). There is little question on this record that Altesse knowingly violated the TRO. The trial court heard evidence that Altesse was aware of the TRO

4

as soon as it was signed. The TRO directed Altesse to turn over all assets of ABACAW to the Wilsons, yet Boudreaux wrote numerous checks and made other cash transfers after the TRO was signed. Boudreaux admitted that Altesse held itself out as an owner or agent of ABACAW and used ABACAW's Medicare provider number, National Provider Number, and Medicare license in violation of the TRO. The trial court also heard evidence regarding Altesse's failure to return certain physical assets of ABACAW, although Boudreaux testified she had given some of those assets to charity. Regardless, the record before us demonstrates that Altesse did not fully comply with the TRO despite knowing of its requirements.

None of Altesse's excuses for non-compliance is completely persuasive. Altesse argues that it could not under Texas law turn over its patients to the Wilsons in the short time required by the TRO. But it does not cite, nor are we able to locate, any specific regulation that the TRO required it to violate. The Wilsons point out that 40 TEX. ADMIN. CODE § 97.218 requires notice of a change in the controlling person, but this notice may be made within seven days after the date of the change and does not appear to conflict with the TRO. Moreover, Altesse's argument is inconsistent with evidence that Altesse began treating patients as soon as it purchased ABACAW from the Wilsons.

Altesse argues that it removed the case to federal court because it fairly believed the state lawsuit was a counterclaim to its previously filed federal suit. Even if we ignore the federal court's conclusions that the removal was an attempt to avoid the effect of the TRO and that the state suit was improperly removed, the removal was not a legitimate basis for ignoring the TRO. Post-removal, state-court orders generally "remain in full force and effect until dissolved or modified by the [federal] district court." 28 U.S.C. § 1450.

5

The TRO prohibited contact with patients, employees, and nurses. Boudreaux argues that she could not as a nurse ethically abandon her patients, who needed constant care. Altesse also argues that patients have a right to choose their provider. While both of these assertions may be true, they did not entitle the defendants to violate the TRO by persuading patients to go with Boudreaux to her new company. The TRO broadly prohibited all patient contact, and some violations of that prohibition may indeed have been justified by medical necessity or professional ethical obligations. But the TRO's prohibition on patient contact appears to have been intended primarily to avoid exactly the kind of patient recruitment engaged in by Boudreaux.

Having concluded that Altesse knowingly violated the TRO without a compelling excuse, we turn to whether the extreme sanction imposed for Altesse's violations of the TRO was an abuse of discretion. We conclude that it was. In *TransAmerican*, we held that "a direct relationship must exist between the offensive conduct and the sanction imposed" and that "sanctions must not be excessive." 811 S.W.2d at 917. We have also held that sanctions cannot be "more severe than necessary to satisfy the legitimate purposes of sanctions." *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 850 (Tex. 1992).

While *TransAmerican* and other cases discussed herein involved discovery sanctions subject to specific discovery rules, the legal standards they elaborate apply to this case as well, in which the trial court imposed sanctions under its inherent authority to do so. *See Bennett*, 960 S.W.2d at 40. Our reasoning in *TransAmerican* stemmed primarily from Rule 215's simple requirement that discovery sanctions must be "just." 811 S.W.2d at 916–17; *see also* TEX. R. CIV. P. 215.2(b). Restrictions on extreme discovery sanctions also flow from the recognition that "[t]here are constitutional limitations upon the power of courts, even in aid of their own valid

6

processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *TransAmerican*, 811 S.W.2d at 918 (quoting *Societe Internationale v. Rogers*, 357 U.S. 197, 209 (1958)). Such constitutional considerations are equally applicable to death-penalty sanctions imposed outside the scope of Rule 215. We conclude that legal standards developed to ensure "just" and constitutionally permissible sanctions for discovery violations apply to our review of the sanctions imposed in this case.

Under the *TransAmerican* standards, the beyond-death-penalty sanctions imposed by the trial court must be reconsidered. We discern no direct relationship between the sanctions and the conduct of the party sanctioned, beyond punishment for its own sake. Although sanctions intended to secure compliance with court orders and deter noncompliance are often essential to the orderly conduct of trial-court proceedings, our precedent dictates that courts should avoid a "trial by sanctions" whenever possible. *TransAmerican*, 811 S.W.2d at 918. Sanctions so severe that they prevent a decision on the merits are not justified except in the most severe cases of flagrant bad faith. *Chrysler Corp.*, 841 S.W.2d at 849.

While the trial court used the term "death penalty sanctions" to describe its action, this description actually understates the sanctions' magnitude. The effect of the judgment and TRO was to award the Wilsons the full value of ABACAW at the time it was sold to Altesse, as measured by the agreed contract price. But they also awarded the Wilsons all remaining assets of the company, which were returned to the Wilsons and which they admitted had some value, *plus* the value of the cash transfers made during the pendency of the TRO, *plus* attorney's fees, interest, and costs. The judgment, if paid, makes the Wilsons better off than if they had never sold their company. The Wilsons ended up with both the company and the money for which they agreed to

7

sell the company. This amounts to a double recovery, beyond even the ordinary death-penalty sanctions which we once naively called "the most devastating a trial court can assess against a party." *TransAmerican*, 811 S.W.2d at 917–18.

The Wilsons argue that death-penalty sanctions were justified because Boudreaux's actions resulted in the complete destruction of the company they sold to her. The evidence, however, does not support this argument. Allen Wilson testified that "I'll never get it back to where it was when I sold it to [Boudreaux]," but that "I can get it back to where it's a viable business." Common sense further confirms that the assets returned to the Wilsons (who were experienced in the home healthcare business), including operating permits and licenses and physical assets, had some value. And there was no evidence that the goodwill of the business had been destroyed completely. The business still had some patients and the ability to revive some of its prior success, even by the Wilsons' own testimony.

In addition, the effect of the sanctions and final judgment was that Altesse was deprived of the opportunity to present its claim that it was fraudulently induced to purchase the company due to numerous misrepresentations and nondisclosures by the Wilsons. The record in this appeal offers no indication as to the validity of these claims, but as alleged in the federal-court suit and realleged in state-court pleadings, the claims are indisputably serious. We have held that sanctions, and death-penalty sanctions in particular, cannot be used to effectively adjudicate the merits of a case unless the offending party's conduct justifies a presumption that its claims or defenses lack merit. *Paradigm Oil*, 372 S.W.3d at 184; *TransAmerican*, 811 S.W.2d at 918. Here, nothing about Altesse's conduct—violative of a court order though it may have been—supports a presumption that its claims of fraud and fraudulent inducement lack merit. We cannot tell from the limited

8

proceedings that took place in the trial court whether Altesse's claims have merit. It never had the opportunity to present them.

The trial court also had an obligation "to consider the availability of lesser sanctions before imposing death penalty sanctions." *Cire*, 134 S.W.3d at 840 (emphasis omitted). While the trial court's order recites that no lesser sanction "would be adequate punishment," the court did not duly consider whether some lesser sanction would appropriately punish the defendants' conduct before it awarded "death-penalty-plus" sanctions. Altesse's noncompliance with the TRO does not indicate that its claims and defenses are devoid of merit. The order cites "the complete destruction of the business" as a basis for its sanctions, but as noted the evidence does not support that finding.

In rare cases, extreme bad faith alone might justify extreme sanctions, *Chrysler Corp.*, 841 S.W.2d at 849, but this case does not rise to that level. While the evidence supports the trial court's conclusion that Altesse violated the TRO, the circumstances and evidence also compel the conclusion that Altesse's conduct did not amount to extreme bad faith that would justify the exceptionally harsh sanctions imposed. The TRO in this case was difficult to comply with, essentially requiring the defendants to turn over, in three days, an entire complex business that was providing treatment to dozens of extremely frail and ill patients. As Boudreaux testified, without contradiction,

> This was almost an impossible situation considering all of the mechanics and processes that would have to take place. These patients are on chemo therapy infusions, they are acute patients, they have wound care. It's not something that you can just hand over . . . . [I]t's hard to understand . . . how many different people come in contact with one patient's situation. We have doctors' orders, doctors giving us orders. We have, you know, nurses. They have family members. We have third-party companies that we are responsible to.

9

Given these difficult circumstances and the evidence that Boudreaux did eventually comply with much of the TRO within the 14-day window that it was in effect, we cannot conclude that the punishment fits the crime. *See TransAmerican*, 811 S.W.2d at 917.

For these reasons, the severe sanctions imposed by the trial court were an abuse of discretion. Accordingly, without hearing oral argument, *see* TEX. R. APP. P. 59.1, we reverse the judgment of the court of appeals and remand this case to the trial court for further proceedings consistent with this opinion.

**OPINION DELIVERED:** February 23, 2018