McHugh, J.
BACKGROUND
Essentially, this is an action for professional malpractice. Plaintiff, who is proceeding as the administrator of her deceased husband’s estate, seeks to recover money she claims her deceased husband should have recovered in an action brought in the Wrentham District Court (“the underlying action”) if defendant had handled the case properly. Defendant denies mishandling the case and has impleaded a former associate in his office, who tried the case, and Barbara C. Johnson. Ms. Johnson, who represents plaintiff, is plaintiffs daughter and, defendant claims, was intimately involved in preparation and presentation of the case in the underlying action.
The present motion arises out of Ms. Johnson’s conduct at two depositions on February 7, 1995. The first was the deposition of the plaintiff and the second was that of defendant. At the first, Ms. Johnson was acting as counsel to the plaintiff and in the second, she was interrogating. As a result of Ms. Johnson’s conduct at the depositions, defendant seeks sanctions *357 and an order staying further depositions until after a motion for summary judgment is heard.[1]
Full understanding of basis for the relief defendant seeks and of the Court’s decision requires some discussion of the proceedings that took place at the depositions themselves.
II. THE FIRST DEPOSITION
The deposition of plaintiff, an 83 year old woman with limited understanding of the proceedings, began with the usual stipulations. Beginning with the examiner’s ninth question, however, it ran into choppy water:
Q. What do you understand that claim [the claim against defendant Gordon], what do you think that claim is?
A. I can’t understand it, I never met Mr. Gordon, I didn’t know there was such a person living. I don’t know him, I never met him, and I was shocked to find him in the middle of this.
Q. D o you understand that you brought the lawsuit, correct?
Ms. Johnson: I don’t think she understands what you mean. When she is—
Mr. Hutchinson: Fine. You can make the objection and I will proceed. I don’t want you to be coaching the witness. You can make your objections and I’ll proceed.
Q: Do you believe yourself, as the administratrix of the estate of Isador Cholfin, to have a claim against Mr. Gordon?
A: I don’t understand that question.
Ms. Johnson: I don’t think — she doesn’t understand the word claim in the legal sense that you are using it.
Q. Do you think that Mr. Gordon did something that, for which you seek compensation in this lawsuit in your capacity of administratrix of the estate of Isador Cholfin?
Ms. Johnson: The verified complaints speaks for itself.
Mr. Hutchinson: I’m asking her a question.
Ms. Johnson: Then repeat that question.
(The court reporter read back the pending question.)
A: Yes, I think he did wrong. I don’t know—
Ms. Johnson: That’s enough.
Q: What do you think he did wrong?
A: I don’t know where he came from. He appeared out of nowhere.
Q. Is it your position that the estate of Isador Cholfin has somehow been damaged by Mr. Gordon’s conduct?
A: I don’t know. Of course, of course.
Ms. Johnson: That’s the answer.
Q: When you say of course, how was it damaged?
A: In every possible way that a damage could be done.
Q: Well, give me some examples.
A. I don’t know how he came into this picture at all. I never knew such a person existed.
Q: Is there any other way that you can explain how you think the estate has been damaged by Mr. Gordon’s conduct?
Ms. Johnson: Objection. I think—
Mr. Hutchinson: Fine. Make the objection. I would prefer not to have a clarification. I will let the question stand and the answer stand.
Ms. Johnson: She has now answered, essentially the same question three ways.
Mr. Hutchinson: No. It is a different question.
Ms. Johnson: I asked you to go on to the next question. What you are asking for is a legal answer and for her to explain the legal theory upon which this claim was brought.
Mr. Hutchinson: That’s not the question I asked.
Ms. Johnson: That’s what you are asking and she is not in a position to explain, in a legal fashion, what malpractice is, what professional malpractice is, what professional negligence is. She is not in a position to understand how one defines negligence, why a malpractice case, what his duties as a lawyer are. That will be evidence thatwill be put on by other witnesses. And for you to badger her this way is improper. I think you understand perfectly well that she doesn’t understand the theory upon which the complaint is written — which you’re distressed about — and she doesn’t have to know any more than she knows and she can answer all the questions as to the things she knows.
Mr. Hutchinson: I am not going to pay for this rambling on of the transcript.
Ms. Johnson: It’s not rambling.
Mr. Hutchinson: The ground rules for this deposition are if you have an objection, you object. If I would like a clarification I will ask you, and in the absence of this request then you object. I ask the question, I get an answer.
Ms. Johnson: If she can’t answer the question she can say I can’t answer the question.
Mr. Hutchinson: That was something for you to discuss with her in preparation for this.
Ms. Johnson: I did indeed tell her that.
The Witness: I don’t know the man, I don’t know where he came from.
Ms. Johnson: Wait for the question. It’s yes; no; I don’t know; I can’t recall; I can’t answer the question.
Mr. Hutchinson: I would like the question read back. I’m either going to get an answer to it or we may have to seek a court order.
Ms. Johnson: The court can’t order her to answer what she doesn’t know or doesn’t understand, so *358 that would be very frivolous and we would seek damages, we would seek sanctions. So go ahead and be sensible. It is one degree outside and she is over 80 years old, so do your thing. You pay for the cab to the court and we’ll all go.
Tr. 6, line 17 through 11, line 6.
The deposition proceeded in similar fashion for another page with the witness unable to answer questions. The parties then took a break for five minutes so that counsel and client could confer about the case and about the questions the examiner was asking.
Upon resumption, the following exchange occurred:
Q: Ms. Cholfin, you had an opportunity to speak about this matter with your counsel, correct?
A: We just a conversation about it, yes.
Q: Were there any prior answers that you gave that you would like to change at this time?
Ms. Johnson: Can you remember all the questions?
Mr. Hutchinson: Objection, I asked her the question.
Ms. Johnson: That’s a bad faith question, next question. I apologize for that, it wasn’t totally, but there were a number of questions and you just read them off the computer and are refreshed, but she didn’t read them to refresh her memory. If you want to[,] refresh her memory with the questions.
Tr. 12, line 18 through 13, line 9.
A little less than two pages of questions and answers uninterrupted by counsel's interjections then followed. Then this exchange occurred:
Q: Do you know of any activity that Mr. Gordon was responsible for that impacted, in anyway, the result reached in the Millis action [the underlying action on which plaintiffs claim is based]?
Ms. Johnson: Objection to the form. Two questions in one, no foundation.
Q: Do you understand the question?
A: No, I don’t.
Q: I’ll say it again. Are you aware of any activity of Mr. Gordon—
Ms. Johnson: That’s the end of that question.
Mr. Hutchinson: That’s not the end of my question.
Ms. Johnson: If you are going to repeat the same question you have two things—
Mr. Hutchinson: Stop this now.
Ms. Johnson: I am not going to let her answer a question that’s two in one and no foundation similar to when did you stop beating you wife.
Mr. Hutchinson: If you don’t let her answer then we’ll go to court.
Ms. Johnson: We’ll go to court and waste the time if you don’t know how to ask a question.
Q: Are you aware of any activity of Mr. Gordon that impacted the result achieved in the Millis case?
A: I don’t know what result he achieved, I don’t know what result he achieved.
Q: I am not asking — Listen to my question. Are you aware that you received a verdict or an award in the Millis case?
A: No.
Q: You’re not aware of that?
A: No.
Ms. Johnson: I don’t think that she understands what you mean by a verdict. She understands — Did you? She doesn’t know by the words that you used. She hasn’t received anything in hand.
Mr. Hutchinson: I think we have to go see the court.
(Recess)
Tr. 14, line 18 through 16, line 11.
After a short recess, counsel stated that the Court was not immediately available.[2] Then followed three pages of colloquy, two of them a soliloquy by Ms. Johnson. Questioning of the witness then resumed. The very first question put to the witness was met by the witness’ request that the examiner repeat the question and Ms. Johnson’s statement that the examiner should try “to keep [the questions] under 14 words.” Tr. 20, line 8.
Questions and answers then proceeded. A few pages later, however, this exchange occurred:
Q: Well, what was the activity or what were the actions that Mr. Gordon did that you have characterized as interference?
A: I never heard from the man. I never saw the man, I never talked to the man, I didn’t know where he came from.
Q: My question is what actions of Mr. Gordon have you just characterized as being interference?
Ms. Johnson: What did he do?
A: By coming into the picture. Exactly what he did? He didn’t do anything.
Ms. Johnson: When is the first time you met him?
Mr. Hutchinson: Stop, this is my questioning. Ifyou want to direct her when I’m finished, you can.
Ms. Johnson: If she doesn’t understand, she doesn’t understand.
Tr. 26, line 18 through 27, line 11.
The examiner then pursued the basis of the witness’ knowledge:
Q: Who told you that he interfered?
A: Well, from what I hear. Why am I here? Why did you call me? Why am I here?
Q: Are you aware that you brought a lawsuit against Mr. Gordon?
A: I am aware that whatever my lawyer thinks is necessary and correct, my lawyer will take care of it.
*359 Q: Did you authorize your lawyer to ñle a lawsuit on your behalf against Mr. Gordon?
A: Yes, I did.
Q: Why was that?
A: Because it was the proper thing to do.
Q: Were you aware of any facts that Mr. Gordon’s conduct somehow caused the estate harm?
A: His entire conduct from A to Z.
Q: The question is were you ever aware of any facts that Mr. Gordon’s conduct caused the estate of Isadore Cholfin harm?
A: I don’t know what he did, and I really don’t know what he did or what he tried to do or didn’t do.
Ms. Johnson: What did he want?
Mr. Hutchinson: Objection.
The witness: I don’t know what he wanted. I don’t know what he wanted and what he was doing there.
Tr. 28, line 18 through 29, line 12.
Another series of questions and answers followed. Then this exchange occurred:
Q. Again, I’m not asking for any exact memory but can you tell me anything in sum or substance, as to what Barbara Johnson told you that first time that shocked you?
A: I’m trying to think of our conversation. I can’t remember the conversation, I really can’t. I’m still— to tell you the truth, I’m still as shocked today as I was when I first heard of him.
Ms. Johnson: What are you shocked by?
Mr. Hutchinson: Objection. You are not asking the questions.
Ms. Johnson: You’ll get the answer and then we can go on. Just ask her what she was shocked by.
Q. Can you recall any statements ever made by Barbara Johnson or anybody else related to Steven Gordon that describes Steven Gordon’s activities with respect to the Millis dispute?
A: I think the first I heard of him was that he made some kind of a settlement with them, or he was looking for money from them.
Ms. Johnson: Ever play the game you’re getting hotter?
The Witness: This whole thing is a mystery.
Q: Do you recall that Barbara Johnson told you that Mr. Gordon was trying to get a settlement from Millis? A: I don’t remember any conversation like that.
Q: Do you recall any conversation whatever from Barbara Johnson that described activities of Steven Gordon?
A: No, I don’t remember anything about him, I really don’t.
Ms. Johnson: Maybe it’s the word “activities.”
Q: Has anyone described for you the conduct of Steven Gordon?
A: Well I don’t what he was doing in the whole thing, I don’t know why he was there.
Q: This is just a Yes or No. Has anyone described for you any conduct of Steven Gordon?
A: What kind of conduct?
Q: Any kind.
A: As I said, it’s like an apparition. I don’t know who he is, if he came for good or bad, I don’t know.
Ms. Johnson: What did he want from you?
Mr. Hutchinson: Objection.
Ms. Johnson: If you don’t want the answer.
Mr. Hutchinson: My question—
Ms. Johnson: You’re trying to obscure the issue, to obfuscate. You are dealing with a woman well into her 80’s at this point, and you know very well what he wanted. The thing that he did and she might construe as conduct, he’s not getting on a horse, he’s not getting down and jogging around the corner. She is construing that differently.
Tr. 40, line 21 through 43, line 7.
Thereafter, the deposition proceeded in that relatively unilluminating fashion for another 20 pages. At page 64, however, matters began a steady downward spiral from which they never recovered. Apparently Gordon, the defendant had been in the deposition room from the outset and, although the record reflects that he had not said a single thing, the following exchange occurred:
Q: Barbara Johnson has told you, (“]mother, I never hired Steven Gordon as an attorney for the estate, [”] or words to that effect?
A: That’s right, he was never hired to be my attorney. Q: I asked you to read paragraphs 15, 16, and 17 of that affidavit.
Ms. Johnson: That’s my affidavit, remember, not yours.
(Pause)
Ms. Johnson: Mr. Gordon, I would appreciate it if you would stop making snide little looks in my direction. I’m, I really don’t appreciate them. I think that you are one of the lowest scumballs that I’ve seen in a long time — and I shouldn’t say it and it’s on the record and Judge McHugh is going to be angry — but I do not appreciate those slimy looks that you make to me. Thank you.
I apologize Your Honor, If you read this, but it’s true. Steven Gordon: Let the record reflect that I was blowing my nose at the time.
Ms. Johnson: At that moment you were doing that, but you have been making them for the last half hour. It’s disgusting. I can’t begin to tell you the looks that you have been giving me. I am not pleased by that kind of behavior.
*360 Mr. Hutchinson: Can you mark that?
(Off-the-record remarks)
Ms. Johnson: I would like to see the document before we go to Cambridge. Because if we go to Cambridge this afternoon I have to take my mother to Newton and I am not driving back into Boston and then back out to Newton again. So I want to see those documents today before I leave. I want to get the documents before I have to leave here to go to Cambridge at all because I’ve been waiting long for those documents and it took you four months to answer my letter, which is a great deal of bad faith. I’ve never seen bad faith like that from attorneys. You ignored my letters I wrote you monthly, November, December, January.
Mr. Hutchinson: Please.
Ms. Johnson: No, we are going to go to the judge, it may as well be on there. I am very depressed by the amount of bad faith shown and the lack of civility by this particular law firm. I am — Let the judge see the whole thing, let it all hang out in the laundry. I want to see those documents, otherwise we have to go through a motion to compel and the judge doesn’t like those kind of discovery things.
Mr. Hutchinson: The documents have been put on the table, for the record.
Ms. Johnson: May I please have them?
Mr. Hutchinson: Yes.
Q: Now, Ms. Cholfin, you have read the paragraph that Barbara Johnson submitted which states that she immediately set out to find another attorney to accept the case. Did you see that?
Ms. Johnson: The documents speaks for itself. She doesn’t have to answer questions on it. She isn’t in my mind, she doesn’t know what I did. She doesn’t know whether I was acting honestly and she doesn’t have to answer about those documents, that particular document at all. It is not something she wrote, not something she declared. The documents speaks for itself.
Next question.
Mr. Hutchinson: If you can mark that objection with it as well.
Q: Ms. Cholfin, you read the following paragraph in this affidavit where Barbara Johnson said that Steven Gordon of Worcester agreed to accept the case?
Ms. Johnson: She read it. I will say that document speaks for itself. You know she read it, you gave it to her to read and that’s a veiy stupid question. We have to pay three dollars a page ¡For this transcript now and you are asking her things that are obviously plain and that you won’t bother — I mean it’s just the most useless thing. Get on and ask the questions that are relevant. That document speaks to itself.
Mr. Hutchinson: Are you instructing her not to answer that question?
Ms. Johnson: You saw her read it. Isn’t that a wasteful question? I’m really tired of this.
I’m going to make a motion that I’m now looking at these documents that you gave me and I can’t read them. These aren’t decent copies, they’re totally illegible. I do want to go to court and speak to the judge and tell him some of the problems in this case.
Q: Are those two paragraphs that are, I just pointed your attention to, inconsistent with what Barbara Johnson told you while this case was ongoing?
Ms. Johnson: You can not have her say what I told her, and therefore, that is a totally bad faith question. Objection.
Mr. Hutchinson: Are you instructing her not to answer?
Ms. Johnson: The jury would make up their mind about whether it’s inconsistent, it’s not up to her. Ask her meaningful, substantial questions. Objection. Next question.
Mr. Hutchinson: Are you instructing her not to answer?
Ms. Johnson: What is the question now? Do you still want to know whether she read it? She read it. Say, yes, you have read it.
A: Yes, I did read it.
Ms. Johnson: Next question.
Tr. 64, line 6 through 68, line 24.
The remainder of the deposition accomplished little of substance. At page 72, the examiner asked the witness whether “Barbara Johnson [was] authorized, on behalf of the estate, to submit this affidavit for the court,” to which Ms. Johnson stated “[t]hat is the most bad faith question I’ve ever known.” Tr. 72, lines 11-14, and then proceeded with an explanation of the circumstances under which affidavits may be filed and commentary on the examiner’s lack of good faith. Tr. 72, line 14 through 73, line 4.
A few pages later the following question produced the following answer:
Q: Who was your attorney that tried the case resulting in that award?
A: I don’t know if John was still there or not, I really don’t remember. I don’t know whether it was John or Ms. Johnson at the time.
Ms. Johnson: The trial — Wait a minute.
Mr. Hutchinson: The question stands.
Ms. Johnson: What is the question again, who is the attorney when? Please read the question back, otherwise we would go to the court right now.
(The court reporter read back the prior question and answer)
Ms. Johnson: That was the most bad faith question because you know damn well that John Garrity *361 tried that case. You are the slimiest thing I have come across. I am ready to go to the court myself.
I am not going to put up with this kind of stuff, Judge McHugh. I think this is the kind of behavior — never mind the fact that I am losing my temper inappropriately at this juncture at the deposition — however, this is the kind of slimy kind of, low kind of tactics where this attorney is not interested in justice, he is not interested in truth. He is with a total, with a very, with a very, savoir-faire, very presentable face that he puts on, but his motive is reprehensible and that’s what I can’t tolerate. He knows very well who the attorney is at the time of trial. ..
Tr. 85, line 10 through 86, line 15. Toward the end there was this exchange:
Q: Ms. Cholfin, is it fair to say that you really don’t know any of the facts that are the basis of your claim?
A: I’ve told you everything I know.
Ms. Johnson: See, that’s — again, I am going to address the Judge, if he is going to see this. Again, that is a total misrepresentation. She knows the facts. There are very few facts in this case. She never met face — with Steven Gordon, she never talked to him, she never received letters from him, he never called her, she never called him, she never knew him. That is all this woman knows. That is all she knows. She know she had a legitimate case against Millis and she knows that she had three attorneys representing her, none of whom did a hell of a lot, and suddenly at the end she gets this Bozo the Clown [referring to the defendant] to come in and he asks her for $8,500 and then he flies a motion in court to have the Judge vacate $1,700 and change that was awarded to her, or allegedly awarded to her, and give it to him instead. If I wanted her to have a heart attack — I’ve given her every single piece of paper that has gone out of this case.
Now, this is for the Judge to hear. You have to stop laughing. You are the funniest looking person, you really are.
The Witness: I have to laugh watching you. You belong on television.
Ms. Johnson: It is disgusting what you are doing, Mr.Gordon, it really is.
The Witness: I don’t think it’s funny.
Ms. Johnson: Therefore, the case, here’s the bad faith, Your Honor, because I am addressing this to Your Honor.
Mr. Hutchinson: This is a deposition.
Ms. Johnson: You can show it to the Judge.
Mr. Hutchinson: You are not going to make it on the record.
Ms. Johnson: I want it in there and I want to know that we’ve discussed it. And the thing is that you know that the case is declaratory judgment for the court to make a determination and when the summary judgment is, when the, when this case goes to trial the case won’t be put on through her as a witness because she doesn’t know anything, she doesn’t know the legal terms, that is what is contusing her in this. And you haven’t been gentlemanly enough to explain them to her and that’s why you have elicited the kinds of responses you wanted.
Now, she knows nothing except this man came out of the woodwork wanting $8,500. That’s enough to incense her and shock her and to upset her. Any jury will believe that. All the rest will be put on through other witnesses. Now, the underlying thing as to the Millis, she will, testify she knows the facts, we have the evidence.
Tr. 98, line 5 through 100, line 16. Shortly thereafter, the deposition ended.
During the afternoon’s deposition, Ms. Johnson was the examiner and the defendant, Mr. Gordon, was the witness. It is not necessary to repeat in comparable detail the events that occurred during the afternoon’s proceedings. Suffice it to say that the deposition elicited more substantive information and had fewer exchanges of the type just described than the morning session had. At the end of the afternoon session, however, Ms. Johnson called Mr. Gordon a “liar,” an “animal” and a “son-of-a-bitch,” Tr. 101, Line 16; 102, Line 6-23. Enroute to that ignominious end, the following exchange occurred:
Q: So you are saying the only things that you filed in the Wrentham, District Court is your bill and a list of the tasks—
Mr. Hutchinson: Objection.
Q: — that you allegedly performed?
Mr. Hutchinson: Objection.
A: I submitted materials—
Q: Yes or no, yes or no.
A: I submitted the materials to the Wrentham District Court which indicate what I did and the amount of time spent on it, and I believe the day and dates on which the work was performed.
Q: So you did no time slips: Is that true? You have no time slips at all for your work done that were made contemporaneously with the work done?
A: The answer—
Ms. Johnson: Strike that question. I would appreciate it that you don’t slurp all over the table. Sit up straight like a man.
Mr. Hutchinson: One more comment like that and this deposition is going to be adjourned.
Ms. Johnson: I think its leading to his stuffing off the questions, his whole body language, and I think if he sit up straight in his chair like a school child he might say yes or no, maybe.
Q: I’m going to ask—
*362 Mr. Hutchinson: The record should reflect that we’re all laughing right now.
Ms. Johnson: He’s a fool.
Mr. Hutchinson: That’s it. This deposition is over. Q: Did you make any contemporaneous writing—
Ms. Johnson. I’ll compel him. I’m going to compel and I’ll insist that McHugh give us an evidentiary hearing.
The Witness: I don’t have to sit here and be called a scumball, a cheat, a slime bucket and anything else. There is a rule that says I don’t have to put up with this.
Ms. Johnson: I put up with your behavior all afternoon and all morning. If you would sit down and be honest and forthright we could finish this deposition.
The Witness: It is a quarter to four. I’ll sit here for another five minutes and see how your questions go. If you call me names again—
Ms. Johnson: Then you stop laughing, sit down and be serious.
The Witness: I’m not going to sit here and listen to this and I’m not obligated to do that.
Ms. Johnson: We’ll see about that.
Tr. 48, line 20 through 50, line 22. An arrangement was reached and, as stated, the deposition proceeded to conclusion.
Based on the foregoing record, counsel for the defendant has moved for a varieiy of sanctions including a requirement that plaintiff pay 75 percent of the cost of the transcript of his deposition of the plaintiff and that no further discovery be taken until a motion for summary judgment is heard.
III. DISCUSSION
The conduct this disgraceful record contains is the antithesis of the professional manner with which discovery — indeed, all that we do — must proceed. To engage in the practice of law is to engage in a noble profession. It is to approach the resolution of disputes with a spirit of high mindedness and with knowledge that the client’s problems and antagonisms are not the lawyer’s. By providing professional assistance to those who cannot resolve disputes without outside intervention and by championing their causes and interests in a professional manner, lawyers daily perform services of great social utility. But this kind of performance has no place in our judicial system. Behavior of the type this record reveals demeans the participants, demeans the witnesses and demeans the very system and essence of justice itself. It simply cannot be tolerated.
A deposition is an extension of a judicial proceeding. It should be attended and conducted with the same sense of solemnity and the same rules of etiquette that would be required were the parties in the courtroom itself. The lawyer conducting the examination must ask questions and obtain answers — not demean, insult or hurl epithets at the opposing witness or counsel. The lawyer representing a witness must make objections, when objections are required, succinctly and with the same brief precision required during the trial itself. If either lawyer encounters what he or she perceives to be an impenetrable roadblock, the remedy provided by the rules is clear: The deposition should be halted until a judicial resolution can be obtained. Mass.R.Civ.P. 30(d). Self-help through bombast or insults is not an option.
None of this is novel. As the United States District Court for the Eastern District of Pennsylvania ably put it in Hall v. Clifton Precision, 150 F.R.D. 525, 528 (E.D. Pa. 1993)
One of the purposes of the discovery rules in general, and the deposition rules in particular, is to elicit the facts of a case before trial. Another purpose is to even the playing field somewhat by allowing all parties access to the same information, thereby tending to prevent trial by surprise. Depositions serve another purpose as well: the memorializaüon, the freezing, of a witness’s testimony at an early stage of the proceedings, before that witness’s recollection of the events at issue either has faded or has been altered by intervening events, other discovery, or the helpful suggestions of lawyers.
The underlying purpose of a deposition is to find out what a witness saw, heard, or did — what the witness thinks. A deposition is meant to be a question-and-answer conversation between the deposing lawyer and the witness. There is no proper need for the witness’s own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers. The witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness’s words to mold a legally convenient record. It is the witness — not the lawyer — who is the witness. As an advocate, the lawyer is free to frame those facts in a manner favorable to the client, and also to make favorable and creative arguments of law. But the lawyer is not entitled to be creative with the facts. Rather, a lawyer must accept the facts as they develop.
Hundreds of depositions take place each week without incident and in conformity with those standards.
Plaintiff nevertheless opposes defendant’s motion and has filed a lengthy rejoinder setting out the reasons why allowance of the motion would be inappropriate. The sum and substance of the opposition is threefold: Counsel inappropriately lost her temper and regrets doing so, she was provoked into losing her temper and defendant’s alleged lies make some of her anger justified.
Clearly, counsel’s loss of temper, if that’s what it was, was inappropriate. Just as clearly, counsel’s conduct cannot be justified by defendant’s alleged lies. Indeed, none of the alleged lies had been uttered during the morning session. More important, counsel is the advo *363 cate, not the judge. Determination of the responses’ truth is for others. And surely, name-calling is grossly inappropriate even if the responses in fact are false.
That leaves the “provocation” defense. Obviously, I was not present at the deposition and the “cold record” does not reflect what people did as opposed to what they said. I do not know what body language or non-verbal conduct took place during the deposition. In addition, I recognize that non-verbal conduct sometimes can be just as oppressive and just as disruptive as words. But the answer to counsel’s “provocation” claim is clear and simple: No provocation one .can imagine is sufficient to permit a lawyer to call a witness during the course of the deposition a “fool,” “liar” or “son-of-a-bitch.” No provocation is sufficient to permit a lawyer to call another lawyer a “scumball.” Faced with disruptive conduct, verbal or non-verbal, a lawyer’s obligation to his or her client and to the system of justice in which we all participate is to terminate the deposition and to seek judicial intervention, not to engage in retaliatory strikes.
Remaining for consideration is the question of the appropriate remedy. In that regard, Mass.R.Civ.P. 37, although providing for imposition of broad range of sanctions against recalcitrant or obstructive parties, expressly provides only for awards of costs where attorney misconduct is at issue. Under Rule 37(a)(4) therefore, there is ample authority for allowing defendant’s first request, i.e., that plaintiff pay 75% of the cost of her deposition. I find and conclude that awarding defendant those costs would be fair and appropriate and would be tailored to the conduct in which Ms. Johnson engaged. In reaching that conclusion, I have not engaged in a line-by-line comparison of the relative amounts of time the examiner, the witness and Ms. Johnson spoke. I have instead determined that the deposition’s substantive value could have been obtained in about 25% of the time the deposition actually took were it not-for Ms. Johnson’s interference.
Defendant’s second request is that all discovery be stayed until the pending motion for summary judgment has been resolved. Two questions must be faced with respect to that request. First is a question concerning the Court’s power and second is a question whether, if power exists, the power should be exercised here. The first question flows from the absence of any mention of stay orders in the sanction provisions of Rule 37. Power nevertheless can be found in the protective order provisions of Rule 26 and, more specifically, Rule 26(c)(1) which states simply that the Court, “for good cause shown,” may order that “discovery not be had.” Rule 26 was written in broad language and is designed for employment as broadly as circumstances require. See generally J. Smith & H. Zobel, Rules Practice, 7 Mass. Prac. Series 216-17 (1975). It is broad enough to empower the Court to grant the relief defendant seeks.[3]
As a practical matter, the motion for summary judgment may be decided before any further discovery takes place even if no stay order enters. If the motion is not decided before discovery resumes, however, I do not believe that the remedy defendant seeks is appropriate. Counsel's deportment should not, except to an unavoidable extent, affect the merits of the action or its appropriate progress towards resolution. If further discovery is appropriate before the summary-judgment motion is heard and resolved, therefore, it seems to me that a remedy prohibiting that discovery would hit wide of the mark.
As to the form of future discovery, however, I am of the opinion that the behavior Ms. Johnson displayed during the two depositions discussed above demonstrates her inability to conduct depositions upon oral examination in this case in a proper manner. I therefore am of the opinion that she should be prohibited from taking any further oral depositions in this action and that she should be prohibited from appearing at depositions she is not conducting unless she is accompanied by another member of the bar who has filed an appearance for plaintiff in this case and who, alone, will be permitted to speak while the deposition is in progress.[4] See generally Mass.R.Civ.P. 26((c}(2), (c)(3). All other forms of discovery, including depositions under Rule 31, remain available. In addition, the order that follows is personal to Ms. Johnson and does not affect her client’s right to pursue any and all forms of discovery through other counsel.
I recognize that an order like this is extraordinary and I do not issue it lightly. But the record compiled here is the product of no single, perhaps excusable, intemperate outburst. It is the product of sustained misbehavior that began when the first deposition was minutes old and continued until the very end of the second. It is the product of behavior that Ms. Johnson recognized as inappropriate at the time it was occurring, as evidenced by her references to, and soliloquies aimed at, the Court. To know that behavior is wrong but to keep on with that behavior is to manifest either an unwillingness or inability to engage in proper conduct. In either case, nothing short of the order I am entering will, in my view, assure that the process of resolving this action is not further demeaned by a reoccurrence of the same kind of conduct. Moreover, unchecked conduct like this risks dissolving the entire litigation process in the acid of public disgust. It therefore must be dealt with as firmly as considerations of substantial justice permit.
ORDER
In light of the foregoing, it is hereby ORDERED that
1. Plaintiff shall no later than April 7, 1995 pay to defendant 75% of the stenographer’s charges for attendance at the deposition upon oral examination of Sarah Cholfin on February 7, 1995 and
2. Barbara G. Johnson, Esq. is prohibited from taking further depositions upon oral examination in this action, and
*364 3. Barbara G. Johnson, Esq. is prohibited from attending any further depositions upon oral examination in this action unless she is accompanied by another member of the bar who, alone, shall be permitted to make appropriate objections during the deposition’s course.

Part of the problems chronicled below apparently arise out of Ms. Johnson’s disbelief of many of defendant’s factual assertions. Ms. Johnson’s disbelief, in turn, is in many cases the product of her different recollection of events to which both she and defendant were participant witnesses. For that reason, defendant moved before the depositions to have her disqualified as counsel for the plaintiff. Recognizing the limited circumstances under which motions to disqualify should be allowed and the efforts a court should make to find some other way to solve what appear to be problems engendered by an attorney’s appearance, see generally Gorovitz v. Planning Board of Nantucket, 394 Mass. 246, 250 (1984); Commonwealth v. Goldman, 395 Mass. 495, 507-09 (1985), cert. denied, 474 U.S. 906 (1986), I severed the third-party claim for separate trial and denied defendant’s motion to disqualify. Nevertheless, it is clear, both from Ms. Johnson’s pervasive involvement in the underlying events and from her inability to deal with the discovery process as a lawyer instead of as a witness, that she should have had the good sense to withdraw. See MendellKern, Inc. v. Workshop, Inc., 400 Mass. 277, 282 (1987). Nevertheless, I decline for two reasons to revisit the motion to disqualify. First, the remedy I have created is, in my view, precisely tailored to the demonstrated problem and allows plaintiff to maintain her choice of counsel. Second, given the record compiled thus far and the amount in controversy, the likelihood that successor counsel could be persuaded to file an appearance for all purposes is remote. Disqualification of Ms. Johnson thus would likely have a substantially negative impact on plaintiffs claim. As stated below, the remedy for counsel's misconduct should not impact adversely on the merits of the client’s claim except to the extent than an adverse impact is unavoidable.

Apparently, that is initially what the clerk reported. Tr. 16, lines 12-16. A short time later, however, the clerk called back to say that the Court was available at 2:30 that afternoon to hear the parties if they could not resolve their differences earlier. Tr. 22, lines, 9-12. Although it is unrealistic to expect instant access to the Court for resolution of problems that occur during depositions — instant access necessarily requires interrupting other matters then in orderly progress— this case amply illustrates the desirability of prompt access.

My conclusion in that regard does not conflict with the notion that Rule 37 is the exclusive repository of sanctions for discovery malfeasance, see Societe Internationale v. Rogers, 357 U.S. 197, 207 (1958), or with frequent admonitions against resort to concepts of “inherent power” in dealing with litigation management. See, e.g., Imprescia v. Imprescia, 392 Mass. 101, 104 n.3 (1984). Sanctions are designed to compensate for or punish past conduct. Protective orders are designed to ward off future problems. The two thus serve very different functions even though need for their application may be revealed by the very same set of historical facts.

Ms. Johnson need not withdraw. See n.l, supra. New counsel and Ms. Johnson are perfectly free to agree that new counsel’s role will be limited to appearing at depositions, with or without Ms. Johnson, noticed by defendant.