**Debra FRITTER and Thomas Fritter, Plaintiffs,**

v.

**DAFINA, INC., Dafina New York, Inc., and Dal Specialties, Inc., each Individually and d/b/a IMR Powder Company; Expro Chemical Products, Inc.; and Lancaster Container, Inc., Defendants.**

No. 95–CV–874.

United States District Court, N.D. New York.

Oct. 24, 1997.

Bond, Schoeneck & King, L.L.P. (John M. Freyer, Thomas P. McQuade, of counsel), Albany, NY, for Plaintiffs.

James P. Costello, Chicago, IL, for Plaintiffs.

Ahmuty, Demers & McManus (Thomas M. Desimone, of counsel), Albertson, NY, for IMR Powder Co.

Thuillez, Ford, Gold & Conolly, L.L.P. (Michael J. Hutter, of counsel), Albany, NY, for Expro Chemical Products, Inc.

Friedman, Hirschen, Miller, Coughlin & Campito, P.C. (Michael C. Rizzo, of counsel), Schenectady, NY, for Lancaster Container, Inc.

## MEMORANDUM–DECISION AND ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION

On June 27, 1995, Debra and Thomas Fritter ("plaintiffs"), commenced an action to recover damages for personal injuries after a keg of smokeless gun powder exploded. The smokeless gun powder was manufactured by defendant Expro Chemical Products, Inc. ("Expro"), packaged and sold by defendant IMR Powder Company ("IMR"), and sold in a container manufactured by defendant Lancaster Container, Inc. ("Lancaster").

As a result of Expro's repeated failure to provide discovery, plaintiffs filed a motion pursuant to Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure to strike Expro's answer, grant default judgment, and order a trial on damages. In addition, they request a severance of the action against the remaining defendants. Expro opposed the motion. Oral argument was held on October 1, 1997, in Albany, New York. Decision was reserved.

## II. FACTS

On June 29, 1992, in Misawa, Japan, Debra Fritter sustained serious injuries after a keg of gun powder exploded as it was lifted from the floor. Following commencement of their personal injury action, on June 17, 1996 the plaintiffs served a demand for interrogatories on all defendants including Expro. Approximately six weeks later, plaintiffs' attorney wrote Expro's attorney requesting responses to the June 17, 1996 demand. When responses were still not received, on October 29, 1996, plaintiffs' attorney again wrote to Expro's attorney requesting responses to plaintiffs' June 17, 1996 demand. Receiving nothing, in January 1997, the plaintiffs requested a conference to remedy any issues in discovery.[1] A discovery conference was held, and as a result, on February 3, 1997, an order was filed and issued, compelling Expro to answer the outstanding interrogatories within thirty days. Despite the court order, Expro still failed to respond to plaintiffs' interrogatories. Consequently, on April 2, 1997, a second discovery conference was held, and again Expro was ordered to provide the interrogatory responses, this time by April 11, 1997. Finally, Expro provided the interrogatory responses on April 17, 1997.

Unbeknown to anyone except Expro personnel, as a result of this litigation, tests on a sample Lot 17741 of the gun powder at issue, had been conducted by company technicians in February 1997. The tests were ordered by Dennis Fleury ("Fleury"), Director of Technical Services for Expro who was responsible for the chemical and ballistic laboratories. A report dated February 12, 1997 was issued with the test results. Fleury reviewed the report "at the time." (Fleury Aff. p. 2 ¶ 7). Despite these facts, the interrogatories which were finally served on April 17, 1997, stated that "no tests were ordered as all tests are routinely done as part of powder production." The interrogatories were answered by Fleury. This was a blatant falsehood which misled not only the plaintiffs' attorneys, but Expro's own attorney, Michael J. Hutter ("Hutter"). Hutter was not advised about the February 1997 tests until May 1997, despite the fact that he had been representing the company in the action at least since August 1995.

In May 1997, Hutter informed the plaintiffs' attorney that he had just learned that Expro had a sample of the gun powder from Lot 17741, and that his client had tested a portion of the sample in February 1997.[2] On

---

1. The delay in meeting plaintiffs' interrogatory demands is apparently attributed to Expro alone. The record demonstrates that throughout this action, Expro has in many respects been uncooperative with their own attorney.

2. On May 5, 1997, upon learning, that a sample of the gun powder had been tested, Hutter contacted Mirielle Tabib, Esq. ("Tabib"), a Canadian lawyer representing Expro, and requested that she provide him with all records pertaining to

May 13, 1997, at the deposition of Mr. Fleury, it was confirmed that Expro still possessed a sample of the gun powder. Fleury stated that Expro retained one 500 gram sample from each lot of gun powder and stored it in a metal can for seven years. This inquiry resulted in plaintiffs' July 10, 1997 formal request for one hundred grams of the gun powder sample.[3] Following plaintiffs' formal request, if Expro's explanation is accepted, the ensuing communications resulted in a whirlwind of confusion which delayed the delivery of the gun powder sample.[4]

Upon discovering that the gun powder was never delivered, plaintiffs' attorneys requested another conference with the court. On August 6, 1997, a third discovery conference was held when it was reported by Expro that a sample of the gun powder had already been shipped to IMR's facility in Plattsburg, New York, where it was awaiting delivery to plaintiffs' facility in Buffalo, New York.[5] Nevertheless, Expro was ordered to produce the gun powder sample by August 15, 1997. On August 8, 1997, upon learning that the sample was not delivered, and concerned that his client might no longer have the gun powder,

Hutter requested that the August 15, 1997 deadline be extended by seven days. Accordingly, by further court order, the deadline was extended to August 29, 1997.

On August 13, 1997, both Fleury and Lortie reported that a sample of Lot 17741 could not be found. However, it was not until August 26, 1997, that plaintiffs' attorneys were informed that a sample of the gun powder could not be provided because it was either thrown away or misplaced after it was tested. The plaintiffs' attorneys immediately requested another conference. It was scheduled for September 3, 1997. Expro made no effort to locate the missing sample between August 13, 1997 and September 3, 1997. The discovery conference was postponed until September 5, 1997. In the meantime, plaintiffs advised that they would seek permission to move for default judgment. On the morning of September 5, 1997, moments before the start of the fourth discovery conference, Expro advised Hutter that it had finally found the gun powder sample from Lot 17741. A sample was delivered on September 11, 1997.[6] This motion followed on September 17, 1997.

any tests of the gun powder samples from Lot 17741. Hutter's lack of knowledge regarding the February testing is consistent with Expro's uncooperative attitude with respect to the discovery process. The record suggests that besides being difficult, Expro was less than forthright with Hutter.

3. Originally, plaintiffs made a formal request for the gun powder sample on June 18, 1997. However, as a result of a limited supply, Expro requested that the plaintiffs specify the precise amount of the sample needed. Thus, plaintiffs were required to make another formal request on July 10, 1997, indicating the exact amount of the sample they needed pursuant to their discovery demand.

4. According to Expro, the confusion was created by a series of events. As a result of a maternity leave, Tabib delegated her responsibilities to another Canadian lawyer, Laurent Fortier ("Fortier"). Fortier, clothed with Tabib's authority, expected to be involved directly with Fleury. However, Fleury's absence because of a three week vacation, required Fortier to communicate with Eric Lortie ("Lortie"), an Expro employee in the department of Engineering, Research and Design, who had been delegated Fleury's responsibilities. These delegations significantly diluted Expro's effectiveness in meeting plaintiffs' dis-

covery demand and this court's subsequent discovery order.

5. Hutter's belief that the sample had been shipped to IMR was erroneous. Allegedly, this misunderstanding was partly a product of Tabib's and Fleury's delegation of their respective responsibilities. While Expro's counsel generously concedes that it was his erroneous interpretation of a message that led to the misunderstanding, the record demonstrates otherwise. Regardless of counsel's capitulations, the actions of Tabib and Fleury lacked preparedness and competency in anticipating the plaintiffs' discovery demand. Thus, a misunderstanding or mistake which should have been avoidable became inevitable, and became just another in a series of misrepresentations to the court.

6. The court is cognizant of the fact that the sample the plaintiffs received is *purported* to be a sample of the gun powder from Lot 17741. The court also acknowledges that plaintiffs' experts have concluded that they cannot confirm that the purported sample is actually a sample from Lot 17741. Other than the word of Expro personnel, apparently there is no method to verify that the produced sample is, in fact, from Lot 17741. The explanation of Expro personnel in the handling of the sample leaves many doubts and unanswered questions.

## III. DISCUSSION

### 1. Default Judgement

■ The Court may render a default judgment against a party who has failed to fully comply with a discovery order of the court. Fed.R.Civ.P. 37(b)(2)(C). Such a sanction is an extreme measure appropriate only in extreme circumstances. *See Bambu Sales Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir.1995); *Woodstock Ventures LC v. Perry*, 164 F.R.D. 321, 322 (N.D.N.Y.1996)(citing *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 734 (2d Cir.1987)). Consequently, the Second Circuit limits default judgments to circumstances "involving willfulness, bad faith, or any fault on the part of the disobedient party." *Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 356 (E.D.N.Y.1986)(citing *Societe Internationale Pour Participations Industrielles Et Commerciales. S.A. v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1095–96, 2 L.Ed.2d 1255 (1958)); *see Jones*, 836 F.2d at 734. In addition, though, the Second Circuit has held default judgment appropriate where there has been a total dereliction of professional responsibility, evincing circumstances of gross negligence. *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065–66 (2d Cir.1979).

Discovery orders are supposed to be followed, and a disobedient party who fails to follow such orders does so at their own peril. *Bambu*, 58 F.3d at 853 (quoting *Update Art, Inc. v. Modiin Publishing*, 843 F.2d 67, 73 (2d Cir.1988)). Default judgments are available "'not merely to penalize . . . but to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Valentine v. Museum of Modern Art*, 29 F.3d 47, 50 (2d Cir.1994)(quoting *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976)). Moreover, severe sanctions such as a default judgment "prevent[s] undue delay[ ] in the disposition of pending cases and avoid[s] congestion in the court's calendars." *Altschuler*, 109 F.R.D. at 356 (citing *Penthouse Int'l. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 386 (2d Cir.1981)). Therefore, where harsh sanctions are warranted, courts "in this day of burgeoning, costly and protracted litigation" should not shy away from granting a default judgment. *Cine*, 602 F.2d at 1068.

In opposition to plaintiffs' motion for a default judgment, Expro maintains that miscommunications and misunderstandings, not willfulness or bad faith, delayed the delivery of the sample of gun powder.[7] Although conceding that missteps arose which prevented a timely response to plaintiffs' discovery demand, Expro insists that the facts adduced do not demonstrate an intent to avoid production of the gun powder sample. Moreover, they contend that any issues regarding their alleged failure to comply with plaintiffs' discovery demand have been placated by the fact that the gun powder sample from Lot 17741 was finally located and subsequently delivered to CAL services in Buffalo, New York. Accordingly, they request that the court deny plaintiffs' motion and perhaps award some lesser sanction.

■ Expro's position that miscommunications and misunderstandings delayed the delivery of the gun powder sample is not supported by the record.[8] Beginning with plaintiffs' demand for interrogatories, Expro has demonstrated a proclivity to disobey plaintiffs' discovery demands and flout this court's authority. For example, plaintiffs'

---

7. Conspicuously, Expro neglects to broach the issue concerning their noncompliance with this court's February 3, 1997 discovery order which required them to respond to the plaintiffs' demand for interrogatories within thirty days. Expro's failure to respond to the outstanding interrogatories and thus fully comply with this court's discovery orders characterizes their disobedience and unwillingness to comply with plaintiffs' discovery demands.

8. Expro's reliance upon *Woodstock* is misplaced. The facts of that case are dissimilar to the case at bar. First, Expro does not present a "colorable excuse" for their failure to timely respond to plaintiffs' interrogatory requests. Second, the facts establish gross professional negligence. in *Woodstock*, the miscommunications and dilatory tactics were not predicated upon an attitude of disobedience and insolence. Rather, they were a result of one party's desire to settle. Here, Expro has not established that their dilatory tactics and disobedient attitude have been anything but an intentional and deliberate affront to the discovery process.

June 17, 1996 interrogatory demand, as of August 1, 1996, remained outstanding. Concerned, plaintiffs notified Expro about the delay and were assured of a response within thirty days. Finally, without discovery responses for six months, as of January 20, 1997, plaintiffs were forced to invoke the assistance of the court. Consequently, on February 3, 1997, this court issued an order compelling Expro to answer the outstanding interrogatories within thirty days. This order was ignored. Thus, plaintiffs requested an additional conference, finally precipitating Expro's response on April 17, 1997.[9] Such insolence caused unnecessary delays and used vital court resources. Yet, Expro continued to remain obstinate toward plaintiffs' additional discovery demands.

On June 18, 1997, following the deposition of Fleury, plaintiffs requested a sample of the gun powder from Lot 17741. Subsequently, on July 9, 1997, in a letter, Hutter stated that he had forwarded plaintiffs' request to his client and that they were in the process of arranging for the shipment of the gun powder sample.[10] On July 10, 1997, plaintiffs again made a request for the sample of gun powder, indicating that one hundred grams of the sample could be sent to John Fisher, CAL Services, Buffalo, New York. On August 6, 1997, Hutter erroneously informed the plaintiffs that the sample of gun powder from Lot 17741 had been delivered. Subsequently, the court issued an order compelling Expro to produce the gun powder sample from Lot 17741 by August 29, 1997. Nevertheless, on August 26, 1997, Expro informed plaintiffs that they could not deliver the sample because they failed to locate the gun powder. Expro's response on August 26, 1997, characterizes their brazen and cavalier attitude, willing to flout this court's authority and ignore the importance of the discovery process.

As the Director of Technical Services, Fleury maintains that on July 15, 1997, he was informed for the first time about plaintiffs' request for the sample of gun powder.[11] In particular, Fleury stated that Tabib did not indicate where the gun powder sample needed to be shipped or how much was requested.[12] Regardless, it was Tabib's re-

9. Expro failed to accurately respond to plaintiffs' demand for interrogatories. Specifically, Interrogatory No. "26" requested information regarding what tests were performed on the gun powder sample from Lot 17741; when and where such tests were conducted; and the names of the individuals who conducted the tests or ordered that they be conducted. In response, Expro stated that routine tests had been performed before the gun powder was shipped, and that they would have to review their records to obtain copies of the results of these tests. Moreover, Expro stated that no tests were *ordered* as all tests were routinely performed as part of procedure. However, various tests were carried out on the gun powder sample from Lot 17741 in February 1997. Thus, Expro deliberately gave inaccurate information regarding the testing of the gun powder sample. Such actions reveal Expro's contumelious attitude.

10. Hutter informed Tabib by telephone of plaintiffs' request for a sample on June 18, 1997. Tabib was again informed of the request on July 10, 1997. As a consequence, on July 15, 1997, Tabib discussed the matter with Hutter and explained that she would apprise Fleury about the request for the gun powder sample and have him follow through with Expro.

11. Fleury's impression that he first heard about the plaintiffs' request for the sample of gun powder on July 15, 1997, is misleading. While July 15, 1997, was the first time Fleury was informed of the discovery demand, he was quite familiar with the sample and the view that it was a significant issue in future litigation. For example: (1) in February 1997, he ordered specific testing of the sample and he reviewed the test results from the sample; (2) on May 13, 1997, at his deposition he was questioned extensively with regard to Expro's procedures for the preservation of samples of gun powder. Moreover, attorney Hutter questioned the deponent off the record, confirming that Expro still possessed some of the sample that was from Lot 17741. Thus, Fleury's initial awareness of plaintiffs' discovery demand on July 15, 1997, should not imply that he was also unfamiliar with the importance of the sample.

12. Fleury maintains that on July 15, 1997, Tabib failed to indicate where and how much of the sample needed to be delivered. It is Fleury's position that Tabib simply stated that they would be instructed later with regard to the specifics of the delivery. However, the evidence in the record is inconsistent concerning this matter. For instance, pursuant to the discussions between Tabib and Hutter, it is assumed that Tabib was informed of the location and the amount of gun powder that needed to be delivered. According to Hutter, following their discussions, Tabib replied that she would apprise Fleury about the request and see that he followed through with

sponsibility to properly inform Fleury so that he could arrange for the delivery of the sample. For instance, the record establishes that on July 15, 1997, Hutter and Tabib discussed plaintiffs' July 10, 1997 request for delivery of the sample. Pursuant to these discussions, Tabib informed Hutter that even though she was going on a maternity leave, she would see that Fleury followed through with the plaintiffs' discovery demand. Thus, Tabib assumed a responsibility to see that arrangements were made for the delivery of the gun powder sample from Lot 17741. Moreover, as part of this responsibility, she assured Hutter that Fleury would follow through with her client, Expro. Despite these assurances, Expro failed to make a timely delivery of the gun powder sample.

If true that Tabib was remiss in explaining the particulars of the delivery, this fact alone does not negate Fleury's responsibility to act reasonably and accordingly with respect to plaintiffs' request for the sample of gun powder. However, following Tabib's communication that the sample of gun powder needed to be delivered, Fleury failed to act with professional competency and preparedness. For instance, he never attempted to determine the location of the sample or inquire as to where and how much of the sample needed to be delivered.[13] In fact, remaining silent, he quietly left for a three week holiday just three days after he was notified about plaintiffs' request.[14] In addition to this incom-

petence, Fleury lied in responding to Interrogatory No. "26" of plaintiffs' June 17, 1996 interrogatory demand. In particular, Fleury responded that no specific tests were ordered as all tests were routinely done as part of production. Following his response to plaintiffs' interrogatories, in opposition to this motion, Fleury swore under oath that he was aware that the sample was tested in February 1997, contradicting his earlier interrogatory response. These actions very poignantly demonstrate the position Expro has taken throughout the entire discovery process. Fleury's display of indifference with regard to plaintiffs' discovery demand is incomprehensible and an affront to one's intelligence and our discovery process.[15] This display of bad faith and willfulness by Expro cannot be countenanced.

Presently, Expro claims that their failure to comply with plaintiffs' discovery demand and this court's subsequent order has been placated. Specifically, they maintain that the sample of gun powder was finally located and delivered to the plaintiffs on September 11, 1997. Inspired by the possibility of sanctions and a possible default judgment, Fleury miraculously located the sample on September 5, 1997. However, contrary to Expro's position, the evidence has been compromised, casting doubt upon its reliability and authenticity.

Fleury stated that he found the sample of gun powder from Lot 17741 in the chemical lab. However, it was not in its usual small

---

Expro. Therefore, this Court will not take part in the laborious and painstaking task of determining whether Tabib did or did not inform Fleury of the location and amount of sample that needed to be delivered on July 15, 1997. Instead, fault with either individual amounts to a dereliction of professional responsibilities. Such fault will be imputed to their respective employer, Expro.

13. It is difficult to fathom Fleury's silence following Tabib's alleged communication that they would later receive the specifics about the delivery. Fleury was not oblivious to the importance of the gun powder sample, and he also understood the significance of its delivery. Thus, Fleury's actions from July 15, 1997 until July 18, 1997, are questionable. Additionally, it is difficult to fathom why Tabib would not have informed Fleury about the specifics of the gun powder delivery. Certainly, the specifics were

discussed with Hutter during their discussions between June 18, 1997 and July 15, 1997.

14. Lortie, Tabib's replacement while she was on maternity leave, was never notified of Fleury's three week holiday until July 24, 1997. Making matters worse, Fleury's responsibilities were delegated to a subordinate colleague who Fleury later admonished for not making a thorough search for the gun powder sample. Fleury's actions before and after the three week holiday are not indicative of a Director of Technical Services who is responsibly and diligently trying to expedite the delivery of a gun powder sample.

15. The court is aghast at Expro's later discovery of the gun powder sample. Between July 15, 1997 and September 3, 1997, there is no evidence that Fleury personally performed a search of Expro's facilities. Rather, faced with imminent default judgment, he finally decided to personally investigate the matter. Such conduct is

paint can-type but rather in glass jar. Additionally, the shelf where the purported Lot 17741 sample was found, normally contained samples of current lots of powder being produced.[16] Coupling these facts with the history of this litigation, the absence of credibility on the part of Expro personnel, and the fact that there are no tests that can confirm that this sample is from Lot 17741, leads to the conclusion that the evidence has been spoiled.[17]

## IV. CONCLUSION

Beginning with plaintiffs' initial demand for interrogatories, Expro has maintained a posture of disobediance and contempt for this court's authority. The actions of Fleury and Tabib demonstrate a total dereliction of their professional responsibilities. The repeated falsehoods and evasions exhibit a disdain for the discovery process.[18] Such behavior can only be charitably described as grossly negligent. More accurately, it was willful and in bad faith. This incorrigible attitude must be severely punished.

Accordingly, it is

ORDERED, that

1. Plaintiffs' motion is GRANTED;

2. Defendant Expro Chemical Products, Inc.'s answer is stricken;

3. The clerk is directed to enter judgment in favor of the plaintiffs and against defendant Expro Chemical Products, Inc. with the amount of damages to await further proceedings; and

4. The action shall proceed on the plaintiffs' claims against the remaining defendants.

IT IS SO ORDERED.

---

contemptible and demonstrates disdain for the discovery process.

**16.** Lot 17741 was produced in 1991.

**17.** Defendant IMR claims it has some of the gun powder sample from Lot 17741. This was allegedly retained by IMR as the distributor, from the original shipment in 1991. It is not part of the sample retained by Expro. This does not change the plaintiffs' right to receive a sample directly from the manufacturer. IMR and Expro have the same interest in maintaining the position that the gun powder was safe. Moreover, this fortuitous circumstance does not excuse Expro's disobedient and defiant behavior.

**18.** "A falsehood is an attempt to withhold the truth from those who have a right to know." Dr. Laurence J. Peter, *Peter's Quotations; Ideas for*

*Our Time* 192 (William Morrow and Company, Inc.) (1977).